562 S.E.2d 689

**The STATE, Respondent,**

v.

**Tomongo James William McCORD, Appellant.**

**No. 3482.**

Court of Appeals of South Carolina.

Heard March 5, 2002.
Decided April 22, 2002.

478

Senior Assistant Appellate Defender Wanda H. Haile, of S.C. Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, all of Columbia; and Solicitor Ralph E. Hoisington, of N. Charleston, for respondent.

HEARN, C.J.

Tomongo McCord appeals his convictions for first degree criminal sexual conduct (CSC), first degree burglary, kidnapping, and strong arm robbery. McCord contends the trial court erred in its rulings regarding (1) the victim's in-court identification of him, (2) DNA evidence, (3) a composite drawing of the suspect, (4) the solicitor's closing argument, and (5) his entitlement to credit for time served. We affirm in part and reverse in part.

## FACTS

This action arises out of the 1993 robbery and sexual assault of a victim living in a gift shop she owned and operated. The victim was sleeping in her bedroom when she was awakened

by the sound of breaking glass. She went to investigate and saw a man in the hallway. He lunged at her and knocked her to the ground. The man told her he wanted money and he would cut her if she did not stop screaming. She told him the money was in the front of the building. The man grabbed her wrists and started towards the front, but then changed his mind and forced her into the bedroom, turned on the light, and sexually assaulted her.

After the assault, the man forced the victim to the front of the building where the cash register was located. The victim turned on a hall light as they made their way to the front and then turned on lights in the display case next to the register. The man took money out of the register and fled through a back door. The victim immediately called 9–1–1 and reported she had been raped.

The police arrived and discovered a concrete pelican had been used to break a back window. A total of thirteen latent fingerprints and palm prints were taken at the scene. The victim was transported to a local hospital where a CSC protocol kit was performed.

In 1996, four of the thirteen prints were positively identified as McCord's by comparing them to a computer database of known prints. The victim was shown a photographic line-up in 1996 which included McCord's photo, but she chose not to make an identification. She requested a physical lineup instead, which was never held. The rape kit, including semen found on the victim, was transmitted to SLED in 1998, and later a private laboratory, for testing. Blood tests revealed McCord's genetic profile was consistent with the donor of the semen, and the chances of someone else having that genetic profile were approximately 1 in 1.2 billion.

McCord was convicted of first degree CSC, first degree burglary, kidnapping, and strong arm robbery. He received consecutive sentences of thirty years for each charge except robbery, for which he received a consecutive sentence of ten years. McCord appeals.

## DISCUSSION

### I. Victim's In–Court Identification of McCord

McCord first contends the trial court erred in permitting the victim to identify him at trial claiming the identification

was unreliable and equivalent to a suggestive show-up. We disagree.

"Generally, the decision to admit an eyewitness identification is at the trial judge's discretion and will not be disturbed on appeal absent an abuse of such, or the commission of prejudicial legal error." *State v. Moore,* 343 S.C. 282, 288, 540 S.E.2d 445, 448 (2000). "An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification." *State v. Cheeseboro,* 346 S.C. 526, 540, 552 S.E.2d 300, 307–08 (2001) (citing *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)).

"To determine the admissibility of an identification, the court must determine (1) whether the identification process was unduly suggestive and (2) if so, whether the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed." *Id.* at 540, 552 S.E.2d at 308 (citing the two-prong analysis set forth in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). "The central question is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *State v. Stewart,* 275 S.C. 447, 450, 272 S.E.2d 628, 629 (1980). The following factors should be considered in evaluating the totality of the circumstances to determine the likelihood of a misidentification: (1) the witness's opportunity to view the perpetrator at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Cheeseboro,* 346 S.C. at 541, 552 S.E.2d at 308.

In this case the victim testified that when the perpetrator pushed her into the bedroom, "[h]e ... turned on the bedroom light so it was fully lit." She stated that during the sexual assault, she focused on identifying factors about his appearance:

> I decided to concentrate on what I could tell somebody about him, how could I remember this person, what I see about him that I could identify him.... I'm staring at his

face the whole time. I put my hand up there to measure the face with my hand in case he hit me again I would be able to remember who this was. I smelled the smells of him, the color of his skin, the eyes, everything.

She further testified that as she was forced to the front of the building, she turned on the kitchen light and the lights near the cash register. She stated the time elapsed from her first encounter with the perpetrator in the hallway until he left the premises was approximately fifteen minutes. As to her degree of attention, the victim stated, "I watched him the whole time. I never took—turned my back on him. I stared at his face the whole time."

Finally, the victim explained that she was not "unable" to make a selection from the sole photographic lineup; rather, she chose not to select a suspect from the photographic lineup preferring a physical lineup. She stated she did not study all of the pictures in detail because she had asked for a physical lineup, and she "wanted to see the whole body connected with the head." However, a physical lineup was never conducted. The victim stated she was "positive" of her identification of McCord.

 We find no abuse of discretion in the trial court's admission of the identification testimony. Here, the victim testified she did not misidentify the perpetrator, but rather chose not to make a selection from the one photographic lineup she was shown until a physical lineup was conducted. She described the scene as well-lit, as both she and the perpetrator turned on various lights as they moved through several rooms in the building. The victim also had a heightened degree of attention during the incident, which she described in great detail, and she was with the perpetrator for some fifteen minutes, which was not a brief encounter. Therefore, considering the totality of the circumstances, we conclude the trial court did not abuse its discretion in admitting the identification testimony. *See State v. Patrick*, 318 S.C. 352, 357, 457 S.E.2d 632, 635–36 (Ct.App.1995) (finding no abuse of discretion in admission of identification where the victim was with the perpetrator under "well-lighted conditions," the victim testified she looked at him carefully, observed another trial involving the defendant and immediately

knew the defendant "was the one"); *see also State v. Blanchard*, 920 S.W.2d 147, 149 (Mo.Ct.App.1996) ("The fact that a witness is unable to make a positive identification from a photo array does not negate the reliability of their positive in-court identification.") (citation omitted); *Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435, 445 (1994) (finding no error in admission of in-court identification where trial was six and one-half years after the alleged crime).

## II. DNA Testing

■ McCord next contends the trial court erred in failing to suppress the State's DNA evidence because it "was based in part on an analysis of [his] blood, which was seized in violation of the [F]ourth [A]mendment." He asserts South Carolina law enforcement officers performed DNA testing on a blood sample he had previously given to federal authorities in an unrelated case, and that this use constituted an impermissible search and seizure. We disagree.

In 1997, the FBI obtained blood samples from McCord in an unrelated case pursuant to a written consent form.[1]

Prior to trial, McCord moved to suppress this DNA evidence. The trial court denied the motion, finding McCord's consent was broad enough to cover the use of the sample in this case. Additionally, because federal authorities already had the right to develop McCord's DNA profile, state law enforcement officers were entitled to compare the evidence they had obtained against this known sample of McCord's blood. The court analogized this procedure to cases where fingerprint evidence is compared against known prints on file in an FBI database.

---

1. The form provided as follows:

I, Tomongo McCord, do hereby consent and agree to provide the Violent Crime Task Force Officers [d]irected by the U.S. Attorneys Office, blood samples, under medical supervision, and *for what ever purpose the Violent Crime Task Force Department may see fit.*

I understand that *this evidence may be used against me in court* and that I have the constitutional right to refuse to provide this sample. No threats, force, or promises have been made by anyone to induce me to give up this right.

(Emphasis added.)

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. Amend. IV; *see also* S.C. Const. Art. I, § 10 (containing similar proscription under South Carolina law). The United States Supreme Court has declared that evidence seized in violation of the Fourth Amendment must be excluded in federal criminal proceedings. *See State v. Forrester,* 343 S.C. 637, 643, 541 S.E.2d 837, 840 (2001). The Court later applied the Fourth Amendment and its exclusionary rule to the individual states. *Id.* (citation omitted). Thus, all citizens enjoy this federal constitutional protection in every criminal proceeding, whether state or federal. *Id.*

In *Smith v. State,* 744 N.E.2d 437 (Ind.2001), the Supreme Court of Indiana found the defendant had a legitimate expectation of privacy in blood, hair, and saliva samples, and the DNA contained therein, *at the time they were taken.* The court held, however, that comparison of the defendant's DNA profile obtained in an unrelated rape prosecution with evidence in several unsolved cases did not constitute a search and seizure and did not violate the Fourth Amendment. The court reasoned the defendant had no possessory or ownership interest in the DNA profile, "[n]or does society recognize an expectation of privacy in records made for public purposes from legitimately obtained samples." *Id.* at 439.

The Georgia Court of Appeals rendered a similar result in *Bickley v. State,* 227 Ga.App. 413, 489 S.E.2d 167, 169–70 (1997). In *Bickley,* the State presented evidence that the defendant's DNA sample matched semen samples from the two rapes charged in that case. The DNA sample was taken from the defendant pursuant to a search warrant issued in connection with a rape in another county. The defendant moved to suppress the DNA results on the basis the authorities should have gotten a second search warrant before using his DNA results from another incident. The *Bickley* court held the trial court did not err in failing to suppress the DNA evidence because "[t]he sharing of the DNA evidence between law enforcement officials in different counties did not require a second search warrant." *Id.* at 170. The court further stated that "no matter how many times defendant's blood is tested, the DNA results would be identical.... We agree with the trial court that '[i]n this respect, DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations.'" *Id.* (footnote

omitted); *see also Wilson v. State,* 132 Md.App. 510, 752 A.2d 1250, 1272 (2000) (holding privacy claims or unreasonable search and seizure arguments are no longer applicable once a person's blood sample has been lawfully obtained).

We find that the DNA evidence here was properly admitted. No improper search or seizure occurred as McCord's expectation of privacy was extinguished when he voluntarily gave the blood sample to federal authorities without any limitation on the scope of his consent.[2]

### III. Composite Drawing of Suspect

McCord next asserts the trial court erred in allowing a photocopy of a composite drawing of the suspect into evidence "because it violated the best evidence rule and denied [him] his right to a fair trial guaranteed under the fourteenth amendment due process clause and article 1, 3 of the South Carolina State Constitution."

Although the trial court initially ruled the composite was admissible, after several colloquies throughout the course of the trial, the court rescinded its prior ruling and marked the composite for identification only. Furthermore, at the conclusion of trial, the State withdrew its request to admit the composite into evidence. Because the composite was not admitted into evidence, there is no error.

### IV. Solicitor's Closing Argument

McCord next contends the trial "court erred in attempting to cure a *Doyle*[3] violation that was not harmless error."

---

**2.** Assuming the blood sample was obtained in violation of the Fourth Amendment, such violation would not require exclusion of the DNA test results because they inevitably would have been discovered by lawful means. The State had a search warrant to test McCord's blood with which he refused to comply. No argument was raised at trial that the warrant would not have been executable. *See Nix v. Williams,* 467 U.S. 431, 446–47, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial. . . . Suppression, in these circumstances, would do nothing whatever to promote the integrity of the trial process, but would inflict a wholly unacceptable burden on the administration of criminal justice.").

**3.** *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (holding an accused has the right to remain silent and the exercise of that right cannot be used against him).

During closing arguments, the solicitor stated that defense counsel had attacked the State's witness on fingerprint evidence, then stated, "But did you see him put up any experts of their own?" The trial court sustained defense counsel's objection, instructed the jury to disregard the remark, and gave a curative instruction. Thereafter, the solicitor commented that the jury was "entitled ... to consider the evidence which is presented to you and the lack of any evidence presented to you. That goes for both sides. The State and the defense." The trial court again sustained defense counsel's objection, admonished the solicitor not to say that again, and gave a curative instruction to the jury. McCord failed to object to either curative instruction or request a mistrial.

"[I]t is well settled that if the trial judge sustains an objection to testimony and gives the jury a curative instruction to disregard the testimony, the error is deemed cured." *State v. George,* 323 S.C. 496, 510, 476 S.E.2d 903, 911–12 (1996). Furthermore, "[n]o issue is preserved for appellate review if the objecting party accepts the judge's ruling and does not contemporaneously make an additional objection to the sufficiency of the curative charge or move for a mistrial." *Id.* at 510, 476 S.E.2d at 912. Therefore, we find this issue is not preserved for review because the trial court sustained defense counsel's objections and gave a thorough curative instruction without objection or request for a mistrial.

## V. Denial of Credit for Time Served

McCord lastly contends the trial court erred in not crediting him with time served prior to sentencing. We agree.

The jury returned its verdict on October 12, 1999. During sentencing, the solicitor advised the trial court that McCord was currently serving a federal sentence of 105 months for burglarizing a gun shop and possession of a firearm by a convicted felon.[4]

Defense counsel, however, asserted McCord was not in federal custody at this time. Counsel stated McCord "has been in jail on this charge—these warrants were served on

---

**4.** The colloquy at trial indicates that the solicitor presented the trial court with a certified copy of the federal sentence; however, it was never placed in the record before this court.

him on January 7th of 1997" and counsel requested credit "for that time." Counsel stated it was his understanding McCord was required to serve first his state time, then the federal sentence.

After further colloquy, the trial court stated: "[T]here is so much confusion about what that—whether it's federal, whether it's state. I'm inclined, and I do this not to further punish him but for the fact that I have not imposed the life sentence, I decline to give him any credit for any time served thus far." The trial court concluded, "It's within my right to give him credit. But by the fact that I did not impose a life sentence I decline. And that's specifically the reason for it."

Section 24–13–40 of the South Carolina Code states in relevant part:

In every case in computing the time served by a prisoner, full credit against the sentence *shall* be given for time served prior to trial and sentencing. Provided, however, that credit for time served prior to trial and sentencing shall not be given: ... (2) when the prisoner is serving a sentence for one offense and is awaiting trial and sentence for a second offense in which case he shall not receive credit for time served prior to trial in a reduction of his sentence for the second offense.

S.C.Code Ann. § 24–13–40 (Supp.2001) (emphasis added).

█ The trial court denied McCord credit for time served due to (1) the confusing state of the documentation as to whether McCord was serving time on another sentence, and (2) the fact that the court did not give McCord a life sentence. However, this matter is not discretionary with the trial court. *See Allen v. State,* 339 S.C. 393, 395, 529 S.E.2d 541, 542 (2000). To the extent the trial court stated it would not award credit based on the fact that McCord was not given a life sentence and asserted "that's specifically the reason for it," this ruling was in error because section 23–13–40 mandates credit for time served unless an exception applies. Accordingly, we reverse the trial court's ruling in this regard to give credit for time served. After reviewing documentation this court received pursuant to our request at oral argument from both appellate defense and the attorney general's office, we find McCord is entitled to credit for time served beginning

488

June 10, 1997, the date he was incarcerated in the Charleston County Detention Center pending trial on the State's charges against him.

Accordingly, we affirm McCord's convictions, but reverse the trial court's failure to give credit for time served.

**AFFIRMED IN PART and REVERSED IN PART.**

CONNOR and SHULER, JJ., concur.