PREHEARING REPORT

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED 
 ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR. 
 
THE STATE OF SOUTH CAROLINA
 In The Court of Appeals

 
 
 
 
 The State, Respondent,
 
 
 

v.
 
 
 
 
 Tavarus Rogers, Appellant.
 
 
 

Appeal From Beaufort County
  Jackson V. Gregory, Circuit Court Judge

Unpublished Opinion No. 2004-UP-427
 Heard March 10, 2004  Filed July 7, 2004

AFFIRMED

 
 
 
 
 Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.
 Attorney General Henry Dargan McMaster, Chief Deputy Attorney General 
 John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, 
 and Assistant Attorney General Melody J. Brown, all of Columbia; and 
 Solicitor Randolph Murdaugh, III, of Hampton, for Respondent.
 
 
 

PER CURIAM:  A jury convicted Tavarus Rogers 
 of two counts of murder, five counts of kidnapping, one count of armed robbery, 
 and one count of first-degree burglary.  Rogers contends the trial judge erred 
 in admitting:  (1) the in-court identifications of two witnesses; and (2) a 
 note that Rogers allegedly wrote to a co-defendant while he was incarcerated 
 on the charges that are the subject of this appeal.  We affirm.
FACTS 
At approximately 12:30 a.m. on January 2, 1999, Jocelyn 
 Elizabeth Shough Wendel, James Mitchell Riley, and Kristal Mae Wire arrived 
 at a party held in the home of Paul Reischl on Coffin Point Road in Beaufort 
 County, South Carolina.  A number of people were present at the party including 
 Rogers, West McKinnon, Jonathon Gadsen, Collins Gadsen, John Byars, Paul Reischl, 
 and Toby Reischl.
Wendel and Wire testified they only knew a couple of 
 people at the party and were introduced to the others.  Both stated Rogers introduced 
 himself as V.  After about an hour-and-a-half to two hours, Rogers, McKinnon, 
 and the Gadsens left the party.   
Approximately an hour-and-a-half later, two men knocked 
 on the door of Paul Reischls home.  Byars opened the door and the men entered 
 the home wielding guns.  The men attempted to conceal their identity by using 
 some type of white cloth wrapped around their faces. 
Upon entering the home, the men started hitting Byars.  
 They then forced everyone to the floor and the first intruder began demanding 
 money and drugs from Paul Reischl.  Following these demands, he forced Reischl 
 to a back bedroom.  The second intruder, who apparently was witnessing the incident, 
 called out to the first intruder some variation of dont do it V, shortly 
 after which the intruder shot Paul Reischl.  The shooter then returned to the 
 living room and confronted James Mitchell Riley.  After forcing Riley to hand 
 over his money, the intruder shot and killed him as well.  Before leaving the 
 house with the other man, the shooter told everyone in the house you didnt 
 see anything.  After the intruders left, Wire and Wendel ran to a nearby home 
 and called 911. 
Several hours after the shooting, Wire and Wendel gave 
 written statements to investigators.  In one of her two statements, Wire recounted 
 the incident and identified the intruders as two black males.  She, however, 
 did not identify Rogers other than referencing the statement that was made during 
 the incident, V dont do it. Subsequently, investigators presented Wire with 
 three photographic lineups.  Wire was unable to identify anyone in these lineups.
Wendel also was unable to identify anyone in the three 
 photographic lineups that were presented to her shortly after the incident.  
 When describing the incident in her statement, Wendel noted that when the 
 two intruders entered the home, I recognized him V as soon as he came in 
 the door.  Throughout her statement, she described the actions of V.  She 
 also gave a physical description of V. 
On January 6, 1999, Rogers was detained on a coroners 
 warrant. Two days later, while incarcerated, Rogers admitted to investigating 
 officers that he killed the two victims.  On January 10 and 21, 1999, Rogers 
 was arrested on warrants issued by a magistrate.      
On February 8, 1999, a Beaufort County grand jury indicted Rogers for two counts 
 of murder, six counts of kidnapping, one count of assault and battery with intent 
 to kill, one count of first-degree burglary, one count of armed robbery, and 
 one count of possession of a weapon during the commission of a violent crime. 

Prior to trial, Rogerss counsel sought to suppress 
 any in-court identifications of Rogers.  Pursuant to Neal v. Biggers, 
 409 U.S. 188 (1972), [1] the 
 judge held two in camera hearings regarding the in-court identifications 
 of Rogers by Wire and Wendel.   
During her testimony, Wire recounted the incident.  
 She testified that she recognized the intruders because she had seen them earlier 
 in the evening at the party.  Wire identified V as present in the courtroom 
 by pointing to the one in the orange suit.  When questioned about her 
 ability to identify V, Wire stated she had seen the intruders earlier in the 
 evening at the party and she recognized their voices.  She further testified 
 that the intruders faces were not completely covered with the white cloth when 
 they entered the home.   
On cross-examination, Wire admitted that she was unable 
 to identify anyone in the photographic lineups and she did not give a physical 
 description of the intruders, other than their race, in her written statement.  
 She also acknowledged that once she was ordered to the floor during the incident 
 she never looked up.  She further acknowledged that Rogers was the only African-American 
 male in the courtroom wearing an orange detention center uniform.  She 
 also admitted that she had:  seen Rogers at a bond hearing; been informed by 
 an investigating officer that Rogers had been arrested; read newspaper articles 
 regarding the incident; and spoken with Wendell about the incident.
Detectives Sam Roser and Matthew Averill, investigating 
 officers, testified that they interviewed Wire after the incident and showed 
 her the photographic lineups.  Roser testified that Wire told him that she knew 
 the intruders were African-American because their masks were partially open.  
 She also told Roser that she identified V by his braided hairstyle.
At the conclusion of the testimony, Rogerss counsel 
 argued Wires in-court identification should be suppressed given:  Wire gave 
 no physical description of the intruders after the incident; she could not identify 
 Rogers in the photographic lineups; she had seen Rogers at a bond hearing; and 
 Rogers was the only African-American male in the courtroom wearing an orange 
 detention suit.  The judge denied the motion and ruled Wires identification 
 was admissible.
In a subsequent hearing, the judge heard testimony regarding Wendels identification 
 of Rogers.  Wendell testified that at the time of the incident she recognized 
 Rogers as one of the intruders because his mask fell down when he entered the 
 home.  She also knew him as the man who had introduced himself at the party.  
 Wendell admitted that she had not been able to identify Rogers in any of the 
 photographic lineups.  During her testimony, Wendell identified Rogers by pointing 
 to him and describing his attire as an orange jumpsuit.  On cross-examination, 
 she acknowledged that she had seen Rogers at a prior hearing and had read about 
 the incident in the newspaper. 
After the testimony concluded, Rogerss counsel moved to suppress Wendells 
 identification.  He argued the in-court identification procedure was suggestive 
 in that it was the equivalent of an impermissible show-up procedure.  Additionally, 
 he contended Wendells identification was not reliable on the grounds:  she 
 could not identify Rogers in a photographic lineup; she had seen Rogers at prior 
 court proceedings; she had reviewed newspaper articles regarding the incident; 
 and she had discussed the incident with the other victims as well as her father, 
 who had collected the newspaper articles.        
The judge denied Rogerss motion to exclude Wendells in-court identification.  
 Aside from addressing the reliability of Wendells identification, the judge 
 also found Rogers could not claim undue prejudice from the identification of 
 him in court given the fact that his counsel chose not to use an alternate procedure, 
 i.e., placing other African-American males with similar characteristics 
 to Rogers at the defense table or in the courtroom. 
At trial, both Wendell and Wire testified regarding 
 the incident and identified Rogers as the man who shot the two victims.  They 
 also identified Rogers in the courtroom. 
Toby Reischl testified Rogers was at the party and was introduced as V.  
 Although he could not positively identify the intruders, he testified that one 
 of the intruders was referred to as V.  In addition to this testimony and 
 the testimony of the investigating officers, the State introduced, over the 
 objection of defense counsel, a note allegedly written by Rogers to his co-defendant 
 McKinnon while the two were incarcerated. 
The jury convicted Rogers of two counts of murder, five counts of kidnapping, 
 one count of armed robbery, and one count of first-degree burglary.  The judge 
 sentenced Rogers to life imprisonment for each count of murder and the first-degree 
 burglary charge, consecutive thirty-year terms for three of the kidnapping charges, 
 [2] and a concurrent term of twenty-five years for armed robbery.  Rogers 
 appeals.
DISCUSSION
I.  
Rogers argues the trial judge erred in admitting the in-court identifications 
 of Wire and Wendel.     
Generally, the decision to admit an eyewitness identification is at the trial 
 judges discretion and will not be disturbed on appeal absent an abuse of such, 
 or the commission of prejudicial legal error.  State v. Moore, 343 S.C. 
 282, 288, 540 S.E.2d 445, 448 (2000).  However, an eyewitness identification 
 which is unreliable because of suggestive line-up procedures is constitutionally 
 inadmissible as a matter of law.  Id.
A criminal defendant may be deprived of due process of law 
 by an identification procedure that is unnecessarily suggestive and conducive 
 to irreparable mistaken identification.  State v. Brown, 356 S.C. 496, 
 502, 589 S.E.2d 781, 784 (Ct. App. 2003).  An in-court identification of an 
 accused is inadmissible if a suggestive out-of-court identification procedure 
 created a very substantial likelihood of irreparable misidentification. Id.  
 Suggestiveness alone, however, does not require the exclusion of evidence.  
 State v. Stewart, 275 S.C. 447, 450, 272 S.E.2d 628, 629 (1980).  
          To determine the admissibility of an identification, 
 the court must determine (1) whether the identification process was unduly suggestive 
 and (2) if so, whether the out-of-court identification was nevertheless so reliable 
 that no substantial likelihood of misidentification existed.  State v. Cheeseboro, 
 346 S.C. 526, 540, 532 S.E.2d 300, 308 (2001), cert. denied, 535 U.S. 
 933 (2002).  Furthermore, as reliability is the most important factor in determining 
 the admissibility of identification testimony, the key inquiry is whether under 
 all the circumstances the identification was reliable even though the confrontation 
 procedure may have been suggestive.  State v. McCord, 349 S.C. 477, 481, 
 562 S.E.2d 689, 691 (Ct. App. 2002); State v. Blassingame, 338 S.C. 240, 
 251, 525 S.E.2d 535, 541 (Ct. App. 1999).
Several factors should be considered in evaluating the totality of the circumstances 
 to determine the likelihood of a misidentification:

 (1) the witnesss opportunity to view the perpetrator at the time of the 
 crime, (2) the witnesss degree of attention, (3) the accuracy of the witnesss 
 prior description of the perpetrator, (4) the level of certainty demonstrated 
 by the witness at the confrontation, and (5) the length of time between the 
 crime and the confrontation.

McCord, 349 S.C. at 481, 562 S.E.2d at 691.  Only 
 after a determination as to the reliability of a witness identification has 
 been made by the trial court may the witness testify before the jury.  Moore, 
 343 S.C. at 289, 540 S.E.2d at 449.
Although there are questions and apparent inconsistencies involved in Wires 
 and Wendels in-court identifications, we do not believe the trial judge abused 
 his discretion in admitting their testimony.  Specifically, the judge applied 
 the correct standard in determining the admissibility of the testimony and there 
 is evidence to support his decision.  See State v. Wilson, 345 
 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001) (An abuse of discretion occurs when 
 the conclusions of the circuit court either lack evidentiary support or are 
 controlled by an error of law.).
Initially, we find the fact that neither Wire nor Wendel could identify Rogers 
 in a photographic lineup is not dispositive of whether their identifications 
 were admissible.  See McCord, 349 S.C. at 483, 562 S.E.2d at 692 
 (The fact that a witness is unable to make a positive identification from a 
 photo array does not negate the reliability of their positive in-court identification. 
 (quoting State v. Blanchard, 920 S.W.2d 147, 149 (Mo. Ct. App. 1996))); 
 State v. Scipio, 283 S.C. 124, 126-27, 322 S.E.2d 15, 17 (1984) (finding 
 in-court identification of defendant by victim was admissible even though victim 
 failed to identify defendant in photographic lineup).  
Similarly, the fact that the witnesses viewed Rogers at a bond hearing did 
 not preclude a finding that their in-court identification was reliable.  See 
 State v. Cunningham, 275 S.C. 189, 193, 268 S.E.2d 289, 291 (1980) (holding 
 victims in-court identification was admissible even though victim saw the defendant 
 at a preliminary hearing prior to the in-court identification); State v. 
 Covington, 226 S.E.2d 629, 638 (N.C. 1976) ([T]he viewing of a defendant 
 in the courtroom during the various stages of a criminal proceeding by witnesses 
 who are offered to testify as to identification of the defendant is not, of 
 itself, such a confrontation as will taint an in-court identification unless 
 other circumstances are shown which are so unnecessarily suggestive and conducive 
 to irreparable mistaken misidentification as would deprive defendant of his 
 due process rights. (quoting State v. Haskins, 178 S.E.2d 610, 612 (N.C. 
 1971))).
Turning to the requisite identification factors, we find there is evidence 
 to support the judges conclusion.  Both witnesses observed Rogers in a social 
 setting for several hours before the incident.  Wire testified that she was 
 able to identify Rogers because she had seen him earlier and his face was not 
 completely covered when he entered the home.  Wendel also testified that she 
 was able to immediately recognize Rogers when he returned to the home because 
 she saw his face.  Additionally, in her written statement, Wendel gave a detailed 
 description of the incident.  She also provided physical descriptions of V 
 as well as the other intruder.  Furthermore, given the witnesses were held at 
 gunpoint their degree of attention would most likely have been acute.  Although 
 a significant amount of time elapsed, approximately three years, between the 
 incident and the hearing concerning the in-court identification testimony, both 
 witnesses were certain in their in-court identifications of Rogers.    
Admittedly, Wire did not provide a description 
 of the intruders in her written statements beyond describing them as two black 
 males.  However, any uncertainty as to the identification testimony went to 
 the weight of the evidence and not its admissibility.  See State v. 
 Distance, 594 S.E.2d 221, 226 (N.C. Ct. App. 2004) ([A]ny uncertainty in 
 an in-court identification goes to the weight and not the admissibility of the 
 testimony.).  This evidence was then for the jury to weigh.  See State 
 v. Stewart, 275 S.C. 447, 451, 272 S.E.2d 628, 630 (1980) (recognizing that 
 jury is to weigh identification testimony that has some questionable feature).
Finally, even if the in-court identifications were erroneously admitted, particularly 
 that of Wire, any error would not require reversal.  See State v. 
 Simmons, 308 S.C. 80, 83, 417 S.E.2d 92, 94 (1992) (stating under certain 
 circumstances, if the identification is corroborated by either circumstantial 
 or direct evidence, then the harmless error rule might be applicable); State 
 v. Thompson, 276 S.C. 616, 620-21, 281 S.E.2d 216, 219 (1981) (recognizing 
 admission of improper in-court identification may be harmless error where the 
 evidence is merely cumulative to independent and overwhelming evidence of guilt), 
 habeas corpus granted by Thompson v. Leeke, 590 F. Supp. 110 (D.S.C. 
 1984) (finding improper in-court identification did not constitute harmless 
 error where:  robbery victim was the only eyewitness; victim could not identify 
 perpetrator on two occasions; investigating officer pointed out defendant as 
 the man who robbed the victim; victim, at trial, was almost positive that 
 defendant was the perpetrator; and the only other testimony identifying defendant 
 was that of his accomplice and his accomplices wife), affd, 756 F.2d 
 314 (4th Cir. 1985).   
Because the in-court identification testimony was 
 not the only evidence identifying Rogers, any error would be harmless.  Here, 
 Wire, Wendel, and Toby Reischl all testified that they believed Rogers was the 
 intruder who shot the victim because Rogers introduced himself to them at the 
 party as V, and each person heard the second intruder say Dont do it V.  
 Wire also testified she recognized the intruders from earlier in the evening 
 by their voices.  See Stewart, 275 S.C. at 451, 272 S.E.2d at 
 630 (finding witnesses voice identification of defendant was admissible as 
 to the issue of the reliability of the in-court identification).  Rogers does 
 not challenge this evidence on appeal.  Additionally, Wendel was able to identify 
 Rogerss co-defendant by the clothing he had worn during the party.  Based on 
 the foregoing, we affirm the judges decision to admit the identification testimony.

II.
Rogers asserts the trial judge erred in refusing to suppress the note allegedly 
 written by him to his co-defendant while incarcerated.  In support of this assertion, 
 he contends the note was obtained pursuant to an illegal arrest.  Alternatively, 
 he argues that even if the note was not fruit of the illegal arrest, it should 
 have been excluded as being more prejudicial than probative. 
Prior to trial, Rogerss counsel moved to exclude any 
 inculpatory statements made by Rogers while illegally detained under the coroners 
 warrant.  Because the coroners warrant was invalid and the State did 
 not have probable cause to arrest Rogers at the time he confessed to shooting 
 the victims, counsel moved to suppress the admission as fruit of the poisonous 
 tree.  See Taylor v. Alabama, 457 U.S. 687, 690 (1982) ([A] 
 confession obtained through custodial interrogation after an illegal arrest 
 should be excluded unless intervening events break the causal connection between 
 the illegal arrest and the confession so that the confession is sufficiently 
 an act of free will to purge the primary taint. (quoting Wong Sun v. United 
 States, 371 U.S. 471 (1963))).
After a hearing, the trial judge granted Rogerss motion.  He found that at 
 the time the statement was made the State lacked probable cause to arrest Rogers.  
 He further held the coroners warrant was invalid, as conceded by the State, 
 given it was issued without legal authority.  Because the State failed to prove 
 that the taint of the Fourth Amendment violation was purged, the judge suppressed 
 all of the alleged statements as the fruit of the poisonous tree. 
Based on this earlier ruling, Rogerss counsel objected 
 at trial to the admission of the note allegedly written by Rogers to co-defendant 
 West McKinnon.  Counsel argued the note was not relevant and even if found to 
 be relevant, admitting it into evidence would be unfairly prejudicial.  He asserted 
 there was no indication who wrote the letter or who was the intended recipient. 
 Additionally, counsel contended the note should be excluded as evidence obtained 
 from Rogerss illegal detention under the coroners warrant.  He asserted that 
 the magistrates warrant, which was issued after the coroners warrant, did 
 not cure the Fourth Amendment violation because this warrant would not have 
 been obtained but for the information illegally obtained under the coroners 
 warrant.  The trial judge denied the motion, finding the note was admissible 
 given it was volunteered and Rogers was not being questioned at the time it 
 was found.  
Officer Richard Rivers of the Beaufort County Detention 
 Center was then permitted to testify that on January 22, 1999, he saw Rogers 
 slip a magazine into an adjoining cell.  The magazine was retrieved and the 
 handwritten note was found stuck between the pages.  A South Carolina Law Enforcement 
 Division fingerprint analyst found eleven prints on the note, eight of which 
 matched those of Rogers.  Phil  Foote, another Beaufort County Corrections Officer, 
 testified that West McKinnon was in the cell in which Rogers placed the magazine.   

The solicitor read the note as follows:

 What did you tell Mrs. Wilson (the Public Defenders investigator)?  She 
 said our stories are f---ed up.  I told her that after we left P sh-- you 
 drop them  up in brackets again  (Cee and Bro) off at C sh-- and drop 
 me off in Saxonville at luck sh-- about 1 a.m. or later.  Then I called you 
 that morning and you took me to Ladys Island with CAP about 7 or 8 a.m.  
 You gotta f---ing holla at me less you done told these crackas you was there 
 at the time of the sh--, what?  We gotta have our stories top of the line, 
 unquote.  (Flush this sh--  rip it up first*) (*Write me back*).

The fruit of the poisonous tree doctrine holds that 
 where evidence would not have come to light but for the illegal actions of the 
 police, and the evidence has been obtained by the exploitation of that illegality, 
 the evidence must be excluded.  State v. Plath, 277 S.C. 126, 134, 284 
 S.E.2d 221, 226 (1981) (citing Wong Sun v. United States, 371 U.S. 471 
 (1963)), overruled on other grounds by State v. Short, 333 S.C. 
 473, 511 S.E.2d 358 (1999), and State v. Collins, 329 S.C. 23, 495 S.E.2d 
 202 (1998).  Even if the arrest was illegal, the fruit of the poisonous tree 
 doctrine will not apply to a confession if it is freely and voluntarily given.  
 Id. at 134-35, 284 S.E.2d at 226.  
Even assuming Rogers was illegally detained when the note was seized and that 
 its contents constituted a confession, we find the note was not the fruit of 
 the illegal arrest.  Our decision is based on our supreme courts holding in 
 State v. Funchess, 255 S.C. 385, 179 S.E.2d 25 (1971), cert. denied, 
 404 U.S. 915 (1971).  In Funchess, the court directly confronted this 
 issue, stating:

 We conclude and hold that every statement or confession made by a person 
 in custody as the result of an illegal arrest, is not involuntary and inadmissible, 
 but the facts and circumstances surrounding such arrest and the in-custody 
 statement should be considered in determining whether the statement is voluntary 
 and admissible. Voluntariness remains as the test of admissibility.

Id. at 391, 179 S.E.2d at 28.   
In the instant case, there is no evidence that the note was the product of 
 questioning by law enforcement.  Instead, it is clear the note was produced 
 and passed along voluntarily.  Moreover, at the time the note was written Rogers 
 had been served with the magistrates warrant and apparently had spoken with 
 a public defender.  Thus, there were intervening acts that broke any causal 
 connection between the note and the illegal arrest.  Accordingly, we find the 
 trial judge was correct in concluding the note was not the fruit of the illegal 
 arrest.
Furthermore, we disagree with Rogerss contention that the note was not relevant 
 and was unfairly prejudicial.  While Rogers argues the note is too vague to 
 be admitted into evidence, we believe the note constitutes circumstantial evidence 
 of Rogerss guilt and was not so prejudicial as to outweigh it probative value.  
 See Rule 401, SCRE (Relevant evidence means evidence having any tendency 
 to make the existence of any fact that is of consequence to the determination 
 of the action more probable or less probable than it would be without the evidence.); 
 Rule 403, SCRE (Although relevant, evidence may be excluded if its probative 
 value is substantially outweighed by the danger of unfair prejudice.).     
CONCLUSION 
Based on the foregoing, we affirm the admission of the in-court identifications 
 of Rogers as well as the admission of the note written while Rogers was incarcerated.
AFFIRMED.
HUFF and STILWELL, JJ. and CURETON, AJ., concur.

 
 
 [1] Neil v. Biggers, 409 U.S. 188 (1972) (wherein the United States 
 Supreme Court developed a two-prong inquiry to determine the admissibility 
 of an out-of-court identification).  

 
 
 [2]   Although the jury convicted Rogers of five counts of kidnapping, 
 which included the two counts involving the murder victims, the judge apparently 
 declined to sentence Rogers for the remaining kidnapping charges given he 
 was also convicted of the murders.  See State v. Perry, 278 
 S.C. 490, 495, 299 S.E.2d 324, 327 (1983), cert. denied, 461 U.S. 908 
 (1983) (holding, pursuant to section 16-3-910, life imprisonment sentence 
 for kidnapping murder victim was precluded where defendant was sentenced to 
 life imprisonment for murder).