*1046
 
 OPINION
 

 Per Curiam:
 

 This is an appeal from a sentence of death imposed after the third penalty hearing held in this case. After the trial and first penalty hearing, this court reversed appellant’s conviction and remanded for a new trial. After the second trial and penalty hearing, appellant filed a petition for a writ of habeas corpus in federal district court seeking a new penalty hearing, which was granted. On appeal after the third penalty hearing conducted in this case, we conclude that all of appellant’s contentions lack merit and affirm.
 

 
 *1047
 

 FACTS
 

 In March 1980, appellant Patrick Charles McKenna was convicted of one count of first degree murder for the killing of Jack Nobles on January 6, 1979, while both were incarcerated in the Clark County Detention Center. After lockdown that day, Nobles and two other inmates were confined in a cell with appellant. Appellant and Nobles argued, after which appellant choked Nobles to death. One inmate testified that appellant and Nobles argued about a chess game and that appellant choked Nobles when Nobles was in bed. Another inmate testified that appellant and Nobles argued about sex and that appellant shoved Nobles against the bunk and choked him so that Nobles’ knees buckled and he dropped to the ground.
 
 [1]
 
 After a penalty hearing, the jury returned a verdict of death. On appeal, this court reversed appellant’s conviction and remanded for a new trial because the district court improperly allowed appellant’s psychiatrist to testify to admissions appellant made during a psychiatric examination. McKenna v. State, 98 Nev. 38, 639 P.2d 557 (1982).
 

 In September 1982, after a second trial and penalty hearing, appellant was again convicted of one count of first degree murder and sentenced to death. On appeal, this court affirmed the judgment and sentence. McKenna v. State, 101 Nev. 338, 705 P.2d 614 (1985),
 
 cert. denied,
 
 474 U.S. 1093 (1986). On April 18, 1986, appellant filed in the district court a petition for post-conviction relief, which the court denied. On appeal, this court vacated the district court’s order and remanded for reconsideration of the petition, among other things. McKenna v. State, Docket No. 18074 (Order of Remand, October 29, 1987). Appellant subsequently filed a supplemental and amended petition for post-conviction relief. After reconsidering appellant’s petition, the district court again denied appellant relief. This court dismissed the appeal from the order denying the supplemental and amended petition. McKenna v. State, Docket No. 19026 (Order Dismissing Appeal, January 18, 1990). This court subsequently denied rehearing. McKenna v. State, Docket No. 19026 (Order Denying Rehearing, March 7, 1990). The United States Supreme Court again denied a petition for a writ of certiorari.
 
 See
 
 McKenna v. Nevada, 498 U.S. 925 (1990).
 

 Appellant then filed in the United States District Court for the District of Nevada a petition for a writ of habeas corpus seeking a new penalty hearing. The federal district court upheld appellant’s conviction but vacated his sentence. On appeal, the United States Court of Appeals for the Ninth Circuit remanded for the federal district court to consider all of appellant’s claims. The fed
 
 *1048
 
 eral district court clarified its ruling and again ordered that appellant’s death sentence be vacated. The Ninth Circuit affirmed the denial of appellant’s petition as to his conviction, and affirmed the court’s decision to grant the petition as to his sentence of death unless he was resentenced within a reasonable period of time. The Ninth Circuit remanded for entry of a modified order stating that a writ of habeas corpus would issue with respect to appellant’s sentence unless he was resentenced within a reasonable period of time. McKenna v. McDaniel, 65 F.3d 1483 (9th Cir. 1995),
 
 cert. denied,
 
 517 U.S. 1150 (1996). On remand, the federal district court ordered the state district court to conduct a new penalty hearing.
 
 [2]
 

 The third penalty hearing, which is the subject of this appeal, was conducted by the court below on September 9-19, 1996. The jury found six aggravating circumstances — that appellant was previously convicted of: (1) an infamous crime against nature; (2) rape; (3) unlawful escape; (4) robbery, two counts of second degree kidnapping with use of a deadly weapon, and three counts of sexual assault; (5) attempted escape with use of a deadly weapon, ex-felon in possession of a firearm, and two counts of robbery with use of a deadly weapon; and (6) attempted escape with aggravating factors. The jury also found four mitigating circumstances — that appellant: (1) personally suffered physical parental abuse; (2) personally suffered emotional parental abuse; (3) suffered, as a child and young adult, domestic violence; and (4) lost a child. The jury concluded that the mitigating circumstances did not outweigh the aggravating circumstances and returned a verdict of death. On September 23, 1996, the district court sentenced appellant to death. This appeal followed.
 

 DISCUSSION
 

 SWAT officers in the courtroom
 

 Appellant filed in district court a motion to appear at all proceedings without shackles, “shock belt,” blinders, gloves, and SWAT and transportation officers. At the hearing on appellant’s motion, the district court granted the motion in part and explained that there would be an officer at each door, one midway between the door and the right side of the courtroom, and one in a chair between the jury and the witness stand. Defense counsel then requested that not all of the security personnel be uniformed and that the SWAT officers wear civilian clothing. The Director of the
 
 *1049
 
 Clark County Detention Center (CCDC) testified that the number of security personnel was necessary, that one more officer would be added when prisoner witnesses testified, and that he was unwilling to interfere with the way SWAT does its job. The court ordered that appellant’s arms would be free of restraints, his legs would remain restrained and a curtain placed around counsel tables, he would wear a stun belt under his clothing, and the SWAT team would be limited to four officers. Prior to the penalty hearing, the tables in the courtroom were replaced with tables that were enclosed on three sides.
 

 At the hearing on appellant’s motion there apparently were twelve officers in the courtroom. Defense counsel renewed the motion pertaining to security issues, arguing that twelve officers was too many. The district judge said that he reduced the number of SWAT officers from seven to four, which he was told was necessary for security, and that there would be two bailiffs and “a couple” of corrections officers. Defense counsel entered a continuing objection to the number of security officers in the courtroom.
 

 At the close of the penalty hearing and outside the presence of the jury, defense counsel made a final record on the number of SWAT officers. Defense counsel stated that for the duration of the hearing there had been half a dozen SWAT officers in uniform armed with handguns, an unarmed officer sitting between the prosecution and defense tables, and guns enclosed in cases, all of which the jury saw. In response, the prosecutor made a record that one of the prisoner witnesses told SWAT officers that appellant had directed him to do certain things while testifying. The prosecutor said that he decided not to put this evidence on as rebuttal evidence of another attempt to escape, but that the officers considered the information in securing the courtroom.
 

 Appellant contends that the placement of armed security personnel dressed in SWAT uniforms “all around [him]” in the courtroom and the use of uniformed law enforcement personnel in general prejudiced him such that he did not receive a fair penalty hearing. Appellant analogizes to cases which hold that a defendant may not be compelled to stand trial dressed in identifiable prison clothes,
 
 see, e.g.,
 
 Estelle v. Williams, 425 U.S. 501 (1976), and which hold that it is inherently prejudicial to shackle a defendant during the penalty hearing,
 
 see
 
 Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987).
 
 [3]
 
 In his reply brief, appellant
 
 *1050
 
 specifies that eleven corrections officers were present at the penalty hearing.
 

 Although this court has addressed whether security personnel stationed around the courthouse violated a defendant’s due process rights,
 
 see
 
 Elvik v. State, 114 Nev. 883, 965 P.2d 281(1998), the issue of security personnel inside the courtroom is one of first impression. The United States Supreme Court has held that a federal reviewing court’s task in this type of case
 

 is not to.determine whether it might have been feasible for the State to have employed less conspicuous security measures in the courtroom. ... All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant’s right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.
 

 Holbrook v. Flynn, 475 U.S. 560, 572 (1986).
 

 In
 
 Holbrook,
 
 twelve officers were stationed inside the courtroom during trial, including four uniformed state troopers.
 
 Id.
 
 at 570. The six codefendants complained that the state troopers’ presence suggested to the jury that the defendants were of bad character.
 
 Id.
 
 at 563. The Court held that deployment of security personnel inside the courtroom during trial was not inherently prejudicial because of the wide range of inferences the jurors could reasonably draw from the officers’ presence.
 
 Id.
 
 at 568-69. Even if a slight degree of prejudice existed by deployment of the state troopers, sufficient cause for the level of security was found in the state’s need to maintain custody of the defendants during the proceedings.
 
 Id.
 
 at 571.
 

 In the instant case, appellant contends that the jurors saw eleven officers in the courtroom. Although the record could be clearer on this point, it appears that there were eight officers in the courtroom during the penalty hearing, six of whom were SWAT officers.
 

 We conclude that appellant has not shown actual prejudice. The only suggestion of actual prejudice is that one venireperson said that she was not necessarily afraid due to the number of uniformed officers but was a little nervous to see the SWAT officers
 
 *1051
 
 because she did not know what was going on. We cannot tell if this venireperson became a member of the jury. We further conclude that the presence of eight security officers in the courtroom, including six SWAT officers, was not inherently prejudicial. Even if the jurors were aware that deployment of SWAT officers is not common practice, the presence of the six SWAT officers did not force the jury to impose the death penalty.
 
 See id.
 
 at 570-71. In addition, even if appellant was slightly prejudiced by the presence of the SWAT officers, sufficient cause for this level of security could be found in the state’s need to maintain custody over appellant, given the CCDC Director’s testimony and appellant’s history of escape attempts and violent crimes, including a possible plan to escape during the penalty hearing.
 

 Admission of uncharged prior bad acts
 

 Appellant argues that it was fundamentally unfair for the district court to allow the prosecutor to introduce prior bad acts involving an incident where appellant threatened another inmate with shears, and to admit into evidence crimes listed in a letter appellant wrote to Detective Samolovich. We do not address appellant’s contention because, even though appellant objected at an August 3, 1996 hearing, those two prior bad acts were not directly at issue in that proceeding and appellant’s objection was too general to preserve those issues for appeal.
 

 Appellant also argues that it was unfair for the jury to hear evidence of prior bad acts involving Peggy Bond, Tangie Flood, and Harry Heverly. In 1976, appellant beat up Ed Skinner, an acquaintance of Bond’s, forced Bond to steal a stereo, kidnapped her twice, and raped her. In 1978, appellant attempted to murder Heverly after appellant and Michael Perry forcibly entered Heverly’s house outside Reno. Flood was living at Heverly’s house. Appellant pointed a shotgun at Flood’s stomach and shot Heverly in the back of the head. The men then drove away with Flood. Appellant threatened to kill Flood, then forced her out of the car, had her sit on her knees facing away from him, put a gun to her head and told her that if she told the police the truth about what happened he would kill her. Appellant argues that these incidents were so old that he could not effectively rebut them.
 

 The decision to admit particular evidence during the penalty phase is within the sound discretion of the district court and will not be disturbed absent an abuse of that discretion. Wesley v. State, 112 Nev. 503, 519, 916 P.2d 793, 804 (1996),
 
 cert. denied, 520
 
 U.S. 1126, 117 S. Ct. 1268 (1997). Evidence of the defendant’s character and specific instances of conduct is admissible in
 
 *1052
 
 the penalty phase of a capital case, but the evidence must be relevant and the danger of unfair prejudice must not substantially outweigh its probative value. Pellegrini v. State, 104 Nev. 625, 630-31, 764 P.2d 484, 488 (1988);
 
 see
 
 NRS 48.035(1), 175.552(3). In addition, a defendant’s character and record are relevant to the jury’s determination of the appropriate sentence for a capital crime.
 
 Pellegrini,
 
 104 Nev. at 630, 764 P.2d at 488 (citing Jones v. State, 101 Nev. 573, 707 P.2d 1128 (1985)).
 

 The district court held hearings outside the presence of the jury as to the Bond and Flood/Heverly incidents and concluded that there was clear and convincing evidence that both incidents occurred. We conclude that the Bond and Flood/Heverly incidents were relevant to show appellant’s propensity to commit acts of violence.
 
 See
 
 Domingues v. State, 112 Nev. 683, 697, 917 P.2d 1364, 1374 (holding that incidents of squeezing girlfriend’s breasts with so much force that fingers touched and throwing basketball with full force into girlfriend’s face were properly admitted at penalty hearing to show defendant’s propensity to commit violent acts),
 
 cert. denied,
 
 519 U.S. 968, 117 S. Ct. 396 (1996). Further, we conclude that any unfair prejudicial effect of these prior bad acts did not substantially outweigh their probative value. Accordingly, we conclude that the district court did not abuse its discretion in admitting evidence of these prior bad acts.
 

 Jury instruction on the use of character evidence
 

 Appellant contends that the jury was not instructed that it could not consider bad acts in determining the existence of aggravating or mitigating circumstances, or that bad act evidence could not be part of the weighing process.
 

 Appellant did not object to any of the jury instructions and only proposed a lingering doubt jury instruction. Failure to object to or request a jury instruction precludes appellate review, unless the error is patently prejudicial and requires the court to act sua sponte to protect the defendant’s right to a fair trial. Flanagan v. State, 112 Nev. 1409, 1423, 930 P.2d 691, 700 (1996),
 
 cert. denied,
 
 523 U.S. 1083, 118 S. Ct. 1534 (1998). We conclude that no patently prejudicial error occurred here, and we therefore decline to address this issue.
 

 Prosecutorial misconduct in opening statement
 

 On September 11, 1996, in the opening statement, the prose
 
 *1053
 
 cutor misquoted appellant as saying, “If I get the death penalty I’ll kill anybody who gets in my way.” At the end of the opening statement, the prosecutor repeated the misquote and again attributed it to appellant. On September 14, 1996, the prosecutor cleared up his misquote during direct examination of Warden Neven. Warden Neven testified that appellant actually said something like, “If they give me the death sentence, I will do anything and everything I can and have to to get out of here.” On cross-examination of Warden Neven, defense counsel pointed out the prosecutor’s misquote.
 

 Appellant contends that the prosecutor knowingly misquoted him and inappropriately waited three days to correct himself. Appellant did not object to any of the prosecutor’s allegedly improper statements, and we conclude that there was no plain or constitutional error such that we should consider these issues on appeal.
 
 See
 
 Emmons v. State, 107 Nev. 53, 60-61, 807 P.2d 718, 723 (1991); Lord v. State, 107 Nev. 28, 32-33, 806 P.2d 548, 550-51 (1991) (holding that error was harmless where prosecutor overstated the evidence in opening statement because defense counsel clarified error on cross-examination and in closing argument and jury was instructed that argument by counsel is not evidence).
 

 As stated above, the prosecutor clarified on direct examination of Warden Neven that he misquoted appellant, defense counsel pointed out the prosecutor’s misquote, and the jury presumably followed the instruction that argument by counsel is not evidence.
 
 See
 
 Lisle v. State, 113 Nev. 540, 558, 937 P.2d 473, 484 (1997),
 
 clarified on other grounds,
 
 114 Nev. 221, 954 P.2d 744, and
 
 cert.
 
 denied, _ U.S. _, 119 S. Ct. 101 (1998). In addition, Warden Neven testified that appellant could have meant what the prosecutor said in his misquote of appellant.
 

 In the opening statement, the prosecutor also said that Heverly would testify to what he could remember of how appellant tried to kill him. At the time the prosecutor made this statement, the district court had not yet determined whether that prior bad act was admissible.
 

 Appellant argues that the prosecutor knew that a hearing would be held with respect to whether Heverly would testify and therefore did not act in good faith in making this statement to the jury. Appellant did not object to the prosecutor’s comment, and we conclude that there was no error which warrants considering this issue on appeal.
 
 See Emmons,
 
 107 Nev. at 60-61, 807 P.2d at 723. Appellant cannot show any prejudice resulting from the prosecutor’s statement. Even though Heverly did not testify, Flood testified about appellant’s attempt to murder Heverly.
 

 
 *1054
 

 Jury instruction that the verdict may never be influenced by sympathy
 

 Appellant contends that jury instruction number fifteen, which provided in part that “[a] verdict may never be influenced by sympathy, prejudice or public opinion,” undermined the jury’s consideration of mitigating evidence and violated his rights under the Eighth Amendment to the United States Constitution.
 
 See
 
 U.S. Const, amend. VIII. Appellant argues that jury instruction number four, the mitigating circumstances instruction, did not cure the problem, but conflicted with the above instruction.
 

 Appellant failed to object to this instruction below and thus failed to preserve this issue on appeal.
 
 See Flanagan,
 
 112 Nev. at 1423, 930 P.2d at 700. At any rate, no patently prejudicial error occurred because this court has consistently rejected appellant’s argument, holding that a district court may instruct the jury not to consider sympathy during a capital penalty hearing as long as the court also instructs the jury to consider mitigating circumstances.
 
 Wesley,
 
 112 Nev. at 519, 916 P.2d at 804; Lay v. State, 110 Nev. 1189, 1195, 886 P.2d 448, 451-52 (1994). Here, jury instruction number four instructed the jury to consider and weigh any mitigating circumstances. Further, jury instruction number five instructed the jury that (1) any aspect of appellant’s character or record and any of the circumstances of the offense may be considered as mitigating circumstances, and (2) the jury could have mercy on appellant and conclude that the death penalty was inappropriate.
 

 Appellant’s conversation with police detectives
 

 Appellant contends that his conversation with Detective Samolovich was part of “compromise negotiations” and was therefore inadmissible pursuant to NRS 48.105(1) (evidence of conduct or statements made in compromise negotiations is inadmissible). Appellant did not present this argument to the district court. Where a defendant fails to present an argument below and the district court has not considered its merit, we will not consider it on appeal.
 
 See
 
 Guy v. State, 108 Nev. 770, 780, 839 P.2d 578, 584 (1992).
 

 We conclude that appellant’s contention lacks merit at any rate. Under circumstances where Detective Samolovich told appellant that he could not make appellant any promises and that he would give the information to the district attorney, appellant could not have reasonably believed that he was going to negotiate a plea bargain with Detective Samolovich or Detective Levos, who was also present.
 
 See McKenna,
 
 101 Nev. at 344-45, 705 P.2d at 618-19
 
 *1055
 
 (holding that appellant’s nonverbal response to Detective Levos’s question was not privileged as a plea negotiation because appellant had no reasonable expectation that Detectives Samolovich and Levos had the authority to negotiate a plea).
 

 Appellant also contends that introduction of Detective Samolovich’s testimony, insofar as Detective Samolovich discussed the crimes appellant listed in a letter to the detective, violated D’Agostino v. State, 107 Nev. 1001, 823 P.2d 283 (1991), because of insufficient indicia of reliability. We conclude that the district court did not err in admitting this evidence because it was more reliable than that in
 
 D’Agostino. Cf. D’Agostino,
 
 107 Nev. at 1003, 823 P.2d at 284.
 

 Appellant’s motion for a mistrial
 

 Defense counsel moved for a mistrial at the conclusion of testimony on September 13, 1996. Earlier that day, Sean Whaley, a reporter for the Las Vegas Review-Journal, testified about an article he had written based on an interview with appellant in October 1989. Appellant told Whaley during that interview, “As soon as you are sentenced to death you’re thinking about it and you have to decide what you’re going to do.” Whaley read this part of the article during his testimony.
 

 Appellant contends that Whaley’s article informed the jury that a previous jury had sentenced him to death and thereby lessened the jury’s sense of responsibility for determining the appropriateness of the death sentence. Appellant relies upon Caldwell v. Mississippi, 472 U.S. 320 (1985), but acknowledges that he has not located a case directly on point.
 

 Denial of a motion for a mistrial is within the sound discretion of the district court, and that ruling will not be reversed absent a clear showing of abuse of discretion. Lane v. State, 110 Nev. 1156, 1163, 881 P.2d 1358, 1363-64 (1994),
 
 vacated in part,
 
 114 Nev. 299, 956 P.2d 88 (1998). We conclude that Whaley’s testimony about the article did not lessen the jury’s sense of responsibility and that the district court therefore did not abuse its discretion in denying appellant’s motion for a mistrial.
 

 Other motions for a mistrial
 

 Appellant made two other motions for a mistrial. The first was after Warden Neven testified on direct examination that appellant was associated with an Aryan prison gang. The second was after the prosecutor elicited on cross-examination of Deputy Warden Pogue that appellant had been involved with a white supremacy group.
 

 
 *1056
 
 Appellant contends that evidence of his gang membership was tenuous, that the state only pursued the subject to prejudice appellant and inflame the jury, and that admission of this evidence violated his free exercise rights under the First Amendment to the United States Constitution.
 
 See
 
 U.S. Const, amend. I.
 

 We conclude that the district court did not err in denying appellant’s motions for a mistrial.
 
 See Lane,
 
 110 Nev. at 1163, 881 P.2d at 1363-64. With respect to appellant’s first motion for a mistrial, we conclude that Warden Neven’s “Aryan prison gang” statement was inadvertent, and the prosecutor steered the witness away from it. The prosecutor was attempting to elicit testimony that appellant was a high risk prisoner, was associated with other high risk prisoners who had been violent in prison, and was therefore capable of violence despite the additional security measures taken for that class of prisoners.
 

 With respect to appellant’s second motion for a mistrial, we conclude that defense counsel opened the door to appellant’s gang affiliation and that the prosecutor’s subsequent elicitation from Deputy Warden Pogue that the gang was a “white supremacy group” was proper.
 
 See
 
 Taylor v. State, 109 Nev. 849, 860, 858 P.2d 843, 850 (1993) (Shearing, J., concurring in part and dissenting in part) (“ ‘the introduction of inadmissible evidence by one party allows an opponent, in the court’s discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission’ ”) (quoting United States v. Whitworth, 856 F.2d 1268, 1285 (9th Cir. 1988)).
 

 Testimony concerning Richard Moran’s case
 

 Appellant contends that his Eighth Amendment rights were violated because the jury’s sense of responsibility was diminished when the state elicited testimony on cross-examination of James Jackson, who represented Richard Moran, about the appellate process in Moran’s case.
 
 See
 
 U.S. Const. amend. VIII; Moran v. State, 103 Nev. 138, 734 P.2d 712 (1987).
 

 Appellant failed to object to Jackson’s testimony, and we discern no plain or constitutional error.
 
 See Emmons,
 
 107 Nev. at 61, 807 P.2d at 723. Appellant has failed to show that “because of the nature of the prosecutor’s reference to the process of appellate review, the capital sentencing jury failed to apprehend the gravity of its task in determining whether death is the appropriate punishment.” Mazzan v. State, 103 Nev. 69, 72, 733 P.2d 850,
 
 *1057
 
 851 (1987). Here, the testimony the prosecutor elicited from Jackson about the levels and number of appeals in Moran’s case did not diminish the jury’s sense of responsibility and did not violate appellant’s Eighth Amendment rights because the jury learned that Moran
 
 was
 
 executed, despite his numerous appeals. Further, the jury was instructed that if it sentenced appellant to death it had to assume that the sentence would be carried out.
 

 Prosecutorial misconduct in closing argument
 

 Appellant contends that the prosecutor’s closing rebuttal argument went beyond an acceptable argument regarding appellant’s future dangerousness because the prosecutor encouraged the jury to vote in favor of future victims and against appellant. In closing rebuttal argument, the prosecutor said,
 

 Ladies and gentlemen, I tell you that no matter what your verdict, no matter how you sign off on those verdict forms that the judge has given you, no matter what you think about his case, your verdict is likely to sentence someone to death. If you sentence Patrick McKenna to death, obviously it will be he who dies.
 

 The prosecutor also argued that the victims of appellant’s prior bad acts did not deserve what they got, “[a]nd the next one won’t either.” Appellant failed to object below, but argues that this error was not harmless and warrants reversal of his death sentence.
 

 This court must, all too frequently, consider whether a prosecutor’s statement constitutes a proper “future dangerousness” argument or some species of improper plea to or request of the jury. The problem lies either with the prosecutor’s lack of comprehension of or respect for the law on this issue, or with a lack of clarity on the part of this court. If the latter, we here review the framework that this court employs to evaluate these arguments.
 

 We recently stated in Schoels v. State, 114 Nev. 981, 966 P.2d 735 (1998), that a prosecutor may not suggest to or lay responsibility on the jury for the defendant’s future victims, or tell the jury that its verdict constitutes a choice between the defendant and a future innocent victim.
 
 See
 
 Castillo v. State, 114 Nev. 271, 280, 956 P.2d 103, 109 (1998) (holding that it is improper to present jurors with choice of an execution sentence for the defendant or responsibility for the death of an innocent future victim); Howard v. State, 106 Nev. 713, 719, 800 P.2d 175, 178 (1990) (holding that it is improper to ask the jury to vote in favor of future victims and against the defendant). The prosecutor’s argument in the instant case does both, and we conclude that it was improper.
 
 See
 
 
 *1058
 

 Emmons,
 
 107 Nev. at 61, 807 P.2d at 723. Telling the jury that its verdict was “likely to sentence someone to death,” and that if appellant was sentenced to death “it will be he who dies,” invited the jury to conclude that a future innocent victim would die if the jury did not sentence appellant to death.
 

 However, we conclude that the prosecutor’s statements did not so infect the proceedings with unfairness as to violate appellant’s due process rights.
 
 See Castillo,
 
 114 Nev. at 281, 956 P.2d at 109-110 (explaining that the test for evaluating whether the prosecutor’s inappropriate comment warrants a new penalty hearing is whether the comment so infected the hearing with unfairness as to make the resulting verdict a denial of due process). The prosecutor’s statements in the instant case were not as flagrant as that in
 
 Castillo,
 
 where the prosecutor said, “[I]t’s just a question of whether it will be an execution sentence for the killer of [the victim] or for a future victim of this defendant.”
 
 Id.
 
 at 279, 956 P.2d at 109. Even if the prosecutor’s statements had been as improper as that in
 
 Castillo,
 
 we are convinced that a new penalty hearing is not warranted because the record supports all six aggravating circumstances.
 
 [4]
 

 Fairness of penalty hearing
 

 Appellant contends that his penalty hearing was not fair because it is “impossible” to determine on what basis he was sentenced to death. Appellant also contends that the prosecutor’s introduction of his prior bad acts violated the prohibition against double jeopardy and his due process rights under the state and federal constitutions.
 
 See
 
 U.S. Const, amend. V; Nev. Const, art. 1, § 8, cl. 1, 5. Finally, relying on Payne v. Tennessee, 501 U.S. 808 (1991), appellant contends that the state should not have been permitted to present victim impact testimony with respect to crimes that did not constitute the underlying crime supporting the death penalty.
 

 First, the reason why the jury returned a verdict of death is not impossible to determine: the state presented evidence of and the jury found six aggravating circumstances. We conclude that all of the aggravating circumstances are supported by the record. Second, NRS 175.552(3) provides that in the penalty hearing evidence may be presented on aggravating and mitigating circum
 
 *1059
 
 stances concerning the offense, defendant, or victim, and on any other matter which the court determines is relevant to the sentence. Pursuant to NRS 175.552(3), evidence of appellant’s prior bad acts was admissible. We conclude that admission of this evidence did not violate the prohibition against double jeopardy or appellant’s due process rights, nor did it constitute victim impact testimony of a previous crime. This testimony was presented by the prosecutor in support of the aggravating circumstances. Accordingly, we conclude that appellant has failed to show that his penalty hearing was unfair.
 

 Failure to instruct that lingering doubt is a mitigating circumstance
 

 Appellant contends that the district court erred in rejecting a lingering doubt instruction. Appellant concedes that this court has concluded that a capital defendant is not entitled to a lingering doubt instruction, but argues that the instant case is different because the penalty jury was not the same jury that heard the trial.
 

 Evans v. State, 112 Nev. 1172, 1202, 926 P.2d 265, 284 (1996),
 
 cert. denied,
 
 520 U.S. 1245, 117 S. Ct. 1854 (1997), held, pursuant to Franklin v. Lynaugh, 487 U.S. 164 (1988), that there is no constitutional mandate that a capital case jury be instructed that residual or lingering doubt is a mitigating circumstance.
 
 Evans
 
 explained the reasoning underlying
 
 Franklin:
 
 lingering doubts over a defendant’s guilt are not an aspect of the defendant’s character, record, or a circumstance of the offense.
 
 Evans,
 
 112 Nev. at 1202, 926 P.2d at 284. Appellant correctly distinguishes
 
 Evans
 
 and Homick v. State, 108 Nev. 127, 141, 825 P.2d 600, 609 (1992), from the instant case in that in those cases the juries which heard the guilt phase also heard the penalty phase. However, appellant does not explain why this distinction should cause this court to rule differently in his case. Even though the penalty phase jury was composed of entirely different jurors than the guilt phase jury, a lingering doubt over appellant’s guilt is still not an aspect of his character, record, or a circumstance of the offense. Therefore, we conclude that the district court did not err in rejecting appellant’s proposed instruction.
 

 Cumulative error
 

 Appellant contends that cumulative error mandates reversal of both his conviction and his death sentence. This court will not consider any argument that appellant’s conviction should be
 
 *1060
 
 reversed because this appeal is only from the sentence of death. At any rate, the sole error we have discerned does not, by itself, constitute cumulative error, and therefore does not warrant overturning the jury’s verdict of death.
 

 Review of sentence under NRS 177.055(2)
 

 NRS 177.055(2) provides in full:
 

 Whether or not the defendant or his counsel affirmatively waives the appeal, the sentence must be reviewed on the record by the supreme court, which shall consider, in a single proceeding if an appeal is taken:
 

 (a) Any errors enumerated by way of appeal;
 

 (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances;
 

 (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and
 

 (d) Whether the sentence of death is excessive, considering both the crime and the defendant.
 

 We have concluded that none of appellant’s contentions on appeal warrants reversal of his sentence. The jury found six aggravating circumstances based on six prior felony convictions involving the use or threat of violence. We conclude that the record supports all six aggravating circumstances.
 

 No evidence exists that the death penalty was imposed under the influence of passion, prejudice or any arbitrary factor, and we conclude that the penalty in this case is not excessive, considering both the crime and the appellant. Appellant’s killing of Nobles was cold-blooded and deliberate; appellant strangled Nobles to death. Accordingly, we will not disturb the jury’s verdict.
 

 CONCLUSION
 

 Having reviewed appellant’s sentence pursuant to NRS 177.055(2), we affirm the sentence of death.
 

 [1]
 

 McKenna v. State, 101 Nev. 338, 341-42, 705 P.2d 614, 616-17 (1985),
 
 cert. denied,
 
 474 U.S. 1093 (1986).
 

 [2]
 

 The federal court ordered a new penalty hearing based on the application of the “depravity of mind” aggravating circumstance. We note that NRS 200.033 no longer includes “depravity of mind” as an aggravating circumstance.
 
 See
 
 1995 Nev. Stat., ch. 467, § 1, at 1491.
 

 [3]
 

 The only cases appellant cites which concern due process at the
 
 penalty
 
 stage of trial are
 
 Elledge
 
 and Duckett v. State, 104 Nev. 6, 752 P.2d 752 (1988). Neither case holds that having numerous security personnel in the courtroom is inherently prejudicial.
 
 Elledge
 
 holds that a court must consider less restrictive alternatives before shackling a defendant, who must have an opportunity to challenge the court’s decision to shackle.
 
 Elledge,
 
 823 F.2d at
 
 *1050
 
 1451-52.
 
 Duckett
 
 holds that the decision to physically restrain a defendant at the penalty stage of the trial is left to the sound discretion of the trial court, which must balance state interests against the interest in preventing prejudice to the defendant.
 
 Duckett,
 
 104 Nev. at 11, 752 P.2d at 755.
 

 [4]
 

 In
 
 Castillo,
 
 we stated that “although a portion of the prosecutor’s argument was improper, the improper portion did not unfairly prejudice Castillo in light of the overwhelming evidence of his guilt.”
 
 Castillo,
 
 114 Nev. at 281, 956 P.2d at 110. Although we referred to Castillo’s guilt, our determination was based on the overwhelming evidence supporting the aggravating circumstances in that case. The opinion thus stands corrected.