WILLIE HERMAN, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 43214

February 23, 2006                    128 P.3d 469

---

[Rehearing denied April 18, 2006]

[En banc reconsideration denied June 12, 2006]

*Karla K. Butko*, Reno, for Appellant.

*George Chanos*, Attorney General, Carson City; *Richard A. Gammick*, District Attorney, and *Joseph R. Plater III*, Deputy District Attorney, Washoe County, for Respondent.

Before ROSE, C. J., DOUGLAS and PARRAGUIRRE, JJ.

## OPINION

*Per Curiam:*

In this appeal, we consider whether DNA evidence voluntarily submitted to a public facility to absolve a defendant of a crime may be used in an unrelated criminal prosecution. We also consider whether reading a presentence report to a sentencing jury is error when the report cannot be made part of the public record. We conclude that the DNA evidence was properly admitted and that the presentence report was improperly read to the jury. We affirm Herman's first-degree murder conviction, but we reverse and remand the matter for a new sentencing phase.

## FACTS

A jury convicted appellant Willie Herman of the first-degree murder of Leslie Carter. In 1997, Carter was found dead in the women's bathroom of Wingfield Park in downtown Reno. Carter's pants were pulled off her right leg and half way down her left leg indicating possible sexual assault. Seven dollars were found in her pants pocket, but many of her other personal belongings were strewn about the bathroom floor. It was clear from Carter's injuries that she had been subject to a violent offense.

The authorities located a strand of Herman's hair on the partition in the bathroom. Blood that was not Carter's was found on the toilet seat, partition and bathroom wall. Carter's pants also contained blood splatters. The blood evidence was tested in 1997 for a DNA match, but no match was obtained. The blood from the pants was retested in 2000 and matched Herman's DNA profile.

The DNA sample utilized to tie Herman to the murder was obtained when he was charged with robbery in 1999. To acquit himself of this charge, Herman voluntarily submitted a blood sample through his public defender. The sample was tested at the Washoe County Crime Lab, and after a jury trial, aided in Herman's acquittal of the robbery charge. After the trial, the district court ordered "that all property taken from Willie Herman, including cash money, held by any law enforcement agency shall be immediately made available for pick up by Willie Herman." Herman, however, was unable to collect his property because he was incarcerated for an unrelated offense, and his attorney made no effort to collect his property for him. Herman's DNA results were entered into a criminal database without his knowledge or permission.

In 2000, the authorities retested the blood evidence found at Carter's murder scene and matched it to Herman's DNA. After the test confirmed Herman's blood was at the scene, he became the focus of the murder investigation. Herman was incarcerated at the time at the Lovelock Correctional Center for possession of a controlled substance. In June 2000, Reno police detectives, Mohammad Rafaqat and James Stegmaier, went to meet with Herman in Lovelock. The officers did not advise Herman of his *Miranda* rights during this meeting. The questioning was of a general nature, focusing on Herman's knowledge of Carter and her general habits. Herman participated willingly, and the detectives never inquired whether he committed the murder.

The detectives again met with Herman in January 2001. Herman was advised of his *Miranda* rights at this time. The detectives indicated to Herman that it was a mistake to have questioned him during the first meeting without "Mirandizing" him because his

incarceration meant he was in custody. Once the detectives indicated they were going to read Herman his rights, Herman responded that he "need[ed] to talk to someone with some legal knowledge." When the detectives asked for clarification, Herman said he would seek help "[t]hrough the law department." Herman terminated the interview by indicating he wanted to leave.

The detectives returned for a third meeting with Herman in October 2001. This time, the detectives brought a seizure order to obtain an additional DNA sample from Herman to confirm the prior DNA results. During this meeting, Herman stated, without being questioned, that he neither raped nor killed Carter. The meeting concluded after the detectives collected the DNA sample.

During Herman's murder trial, the State called two witnesses who were incarcerated with Herman at separate times. Kenneth Jones testified that Herman told him that he had killed Carter and that he lied to the police because he did not want them to think he did it. Jones further testified that Herman told him that once they were in the bathroom, Carter would not leave him alone. According to what Herman told Jones, Carter and Herman eventually began fighting with each other.

Ronald Marks was the second witness who was incarcerated with Herman. Marks was in the Washoe County jail with Herman and indicated to Herman that he was a "jailhouse lawyer" familiar with DNA legal issues. Herman initially explained to Marks that he had an alibi to explain why his blood was at Carter's murder scene. Herman claimed the blood came from intravenous drug use, which resulted in blood squirting on the wall and floor of the bathroom. Marks told Herman that his story would not withstand a jury's scrutiny.

Herman then changed his story. According to Marks, Herman told him that he went down to see Carter to "get some free sex," which he had heard Carter would give. Once Herman attempted to have sex with Carter, she began to scream "rape." Thereafter, Herman told Marks that "she fought back pretty good but he ended up stomping a mud hole in her ass." Finally, Herman told Marks that "crack cocaine and [the] devil made him do it."

Herman was the only defense witness to testify. He testified that he did not kill Carter and that he did not know how Carter died.

During closing arguments, the prosecutor used a portion of the conversation from the third meeting between Herman and the detectives. The prosecutor indicated that Herman's statement that he did not rape or kill Carter contained information about the crime not available to the general public. Hall also repeatedly stated that Herman could not explain how his blood was found on the victim's pants.

During the conclusion of the guilt phase, one of the jurors sent a note to the district judge asking if he could give a medallion to the victim's family as a gesture to aid in closure. Herman failed to object and agreed that the juror could present the medallion after the conclusion of the sentencing phase. The jury convicted Herman of first-degree murder.

During the sentencing phase, the State argued for life without the possibility of parole. The State presented argument, including reading to the jury a presentence report that detailed multiple prior arrests Herman had sustained. Members of Carter's family, including her brother James Carter, offered victim impact statements during the sentencing phase. James Carter's address was impassioned and included several statements impugning Herman's character. The jury sentenced Herman to life without the possibility of parole. Herman appeals.

## DISCUSSION

### DNA evidence

Herman claims the DNA evidence obtained during his previous robbery trial was inadmissible at his murder trial; however, he failed to raise the issue during trial. We generally do not consider issues raised for the first time on direct appeal.[1] Failure to object to the admission of evidence generally precludes review by this court, although the court may address plain error.[2] We conclude, as set forth below, that no plain error occurred here.

### Privacy interest in DNA sample

The United States and Nevada Constitutions prohibit unreasonable search and seizure.[3] Generally warrantless searches are unreasonable, however, consent exempts a search from probable cause and warrant requirements.[4] Voluntary consent must be proved by clear and persuasive evidence.[5] The State correctly asserts that Herman consented to the use of his DNA sample, waiving potential privacy interests implicated by utilizing the sample as part of the public record.

---

[1]*McKenna v. State*, 114 Nev. 1044, 1054, 968 P.2d 739, 746 (1998).

[2]*Sterling v. State,* 108 Nev. 391, 394, 834 P.2d 400, 402 (1992); NRS 178.602.

[3]U.S. Const. amend. IV; Nev. Const. art. 1, § 18.

[4]*Howe v. State*, 112 Nev. 458, 463, 916 P.2d 153, 157 (1996).

[5]*Lightford v. State*, 90 Nev. 136, 139, 520 P.2d 955, 956 (1974).

Our review of the status of the law concerning the retention of DNA samples begins with statutory regulation. Universally, those who are convicted lose the right to object to collection of a sample. Mandatory collection statutes have consistently survived constitutional challenge.[6] Two theories have consistently supported upholding the statutes. First, the state's interest in maintaining databases to aid in solving past and future crimes overcomes any privacy interest convicted individuals retain.[7] Second, these statutes fall under the "special needs" exception to warrant and probable cause requirements. "[W]here a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."[8]

Several states have dealt with the collection and retention of DNA samples by statute. Some expressly prohibit the storage of suspects' DNA samples in their state databases.[9] Other states explicitly authorize the collection and storage of such samples in their databases.[10] Nevada's statute requires a convicting court to order the collection of a biological sample following a conviction for certain felonies and crimes against children.[11] However, the statute does not provide for the collection or retention of samples from persons who are not convicted or who are convicted of crimes that are not listed in the statute.[12]

The law in this area consistently demonstrates that an individual's consent to provide a DNA sample precludes any claim of constitutional malfeasance. If an individual consents to provide or voluntarily provides a sample in an unrelated case, there is no Fourth Amendment violation.[13]

---

[6]*See Gaines v. State*, 116 Nev. 359, 374, 998 P.2d 166, 175 (2000); *see also U.S. v. Kincade*, 379 F.3d 813, 839 (9th Cir. 2004).

[7]*People v. King*, 99 Cal. Rptr. 2d 220, 227 (Ct. App. 2000).

[8]*Treasury Employees v. Von Raab*, 489 U.S. 656, 665-66 (1989).

[9]*See, e.g.*, Wis. Stat. Ann. § 165.77 (West 1997).

[10]*See, e.g.*, Tex. Gov't Code Ann. § 411.142 (Vernon Supp. 2005).

[11]NRS 176.0913.

[12]We note that NRS 629.161 addresses aspects of DNA retention, but is inapplicable in this context.

[13]*Smith v. State*, 744 N.E.2d 437, 439 (Ind. 2001).

In *Smith v. State*, an Indiana Supreme Court case, the defendant was charged with rape, robbery, and burglary and moved to suppress DNA evidence obtained in a previous unrelated rape case. In the previous case, the defendant was ordered to provide a DNA sample, which the Indiana forensic lab used to create a profile. A jury subsequently acquitted the defendant of the rape charges, concluding the intercourse was consensual. Although the court noted that there is a legitimate privacy interest in one's DNA, it concluded that use of the DNA in the new case was proper because the sample was lawfully obtained and the profile that the state created using the sample belonged to the state and the defendant had no expectation of privacy in the state's records: "[O]nce DNA is used to create a profile, the profile becomes the property of the Crime Lab. Thus, [the defendant] had no possessory or ownership interest in it. Nor does society recognize an expectation of privacy in records made for public purposes from legitimately obtained samples."[14]

Similarly, the Supreme Court of Hawaii held that "once a blood sample is lawfully obtained, a defendant no longer has a possessory or privacy interest in the blood that warrants federal or state constitutional protection."[15] Noting that such privacy concerns are not objectively reasonable by societal standards, the court stated that "no privacy interest persists in either the sample or the profile."[16] Thus, there is substantial support for the position that a defendant extinguishes any expectation of privacy by voluntarily providing a DNA sample without limiting the scope of his consent.[17] When measuring the scope of a suspect's consent, the court uses a reasonable person standard to determine whether the DNA may be used exclusively for one investigation or instead may be used for general investigative purposes.[18]

In this instance, Herman provided his DNA sample for use in a public forum without limitation on the use or storage of the sample. A reasonable person would have understood that the resulting DNA profile, like fingerprints, could be available for general investigative purposes. Given the overwhelming weight of authority holding that a legitimately obtained DNA sample may be used in a subsequent investigation without implicating Fourth Amendment

---

[14]*Id.*

[15]*State v. Hauge*, 79 P.3d 131, 142 (Haw. 2003).

[16]*Id.* at 144.

[17]*State v. McCord*, 562 S.E.2d 689, 693 (S.C. Ct. App. 2002).

[18]*State v. Barkley*, 551 S.E.2d 131, 136 (N.C. Ct. App. 2001).

concerns, we hold that no plain error occurred in admitting evidence of Herman's DNA sample.

### Fruit of the poisonous tree

Herman argues that the original DNA sample was illegally obtained; therefore all evidence flowing from that retention must be excluded as fruit of the poisonous tree. He emphasizes that without his sample, the State would have had no information connecting him as a suspect. As part of this argument, Herman argues the search was unreasonable and that suppression of the evidence is the appropriate remedy.

We conclude that Herman's argument lacks merit because the sample was not illegally retained. Thus, there is no illegal conduct that would justify suppression. Herman's DNA sample was legitimately obtained and made part of the public record when he voluntarily used it in his defense at the earlier trial. Evidence of the sample was properly admitted.[19]

### Reading of presentence report

Herman also contends that the prosecution's reading of the presentence report to the sentencing jury was error; however, he did not raise the issue below. We generally do not consider issues raised for the first time on direct appeal.[20] Failure to object to the admission of evidence generally precludes review by this court, although the court may address plain error and constitutional error sua sponte.[21]

A defendant must show actual prejudice to warrant a new sentencing hearing based on an alleged due process violation.[22] The decision to admit particular evidence is within the sound discretion of the district court.[23] A "sentencing proceeding is not a second trial and the court is privileged to consider facts and circumstances which clearly would not be admissible at trial."[24]

We have consistently afforded the district court wide discretion in its sentencing decisions and have refrained from interfering

---

[19]We have considered Herman's equal protection argument and conclude that Herman has failed to state a cognizable claim.

[20]*McKenna v. State*, 114 Nev. 1044, 1054, 968 P.2d 739, 746 (1998).

[21]*Sterling v. State*, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992).

[22]*McKenna*, 114 Nev. at 1050, 968 P.2d at 742-43.

[23]*Id.* at 1051, 968 P.2d at 744.

[24]*Silks v. State*, 92 Nev. 91, 93-94, 545 P.2d 1159, 1161 (1976).

with the sentence imposed when "the record does not demonstrate prejudice resulting from consideration of information or accusations founded on facts supported only by impalpable or highly suspect evidence."[25] NRS 175.552(3) permits "evidence . . . concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible." However, under the statute, admission of such evidence is bound by constitutional constraints.

Under NRS 176.156, a presentence report is to be presented to both parties, who have the opportunity to object to any factual errors contained in the report. The contents of the report are confidential and are not to be made part of the public record.[26] Herman contends that the prosecution's reading of the presentence report to the jury, including a description of seventeen previous unrelated arrests, was error.

Pursuant to NRS 176.156(5), the presentence report is not to become part of the public record. While it does not appear to have been submitted as a formal copy, it was essentially read into the record and transcribed. The reading of the presentence report to the jury was tantamount to entering it into and making it part of the public record.

In *McKenna v. State*, we stated:

> The decision to admit particular evidence during the penalty phase is within the sound discretion of the district court and will not be disturbed absent an abuse of that discretion. Evidence of the defendant's character and specific instances of conduct is admissible in the penalty phase of a capital case, but the evidence must be relevant and the danger of unfair prejudice must not substantially outweigh its probative value.[27]

In this instance, the prosecutor read the following arrests to the jury during his sentencing summation:

> [T]he defendant had records that reflected that he had been arrested on 17 occasions between 1966 and June, 1998, of the following offenses the disposition of which are unknown:
> Those include possession of marijuana; robbery and mayhem; fugitive from justice; assault and robbery; battery; ag-

---

[25]*Id.* at 94, 545 P.2d at 1161.

[26]NRS 176.156(5).

[27]114 Nev. at 1051-52, 968 P.2d at 744 (citation omitted).

gravated rape; and crimes against nature; theft from a person; resistance to a police officer; attempt to commit the crime of burglary, battery, petty larceny, and possession of paraphernalia; drawing a deadly weapon; robbery and possession of paraphernalia; battery; robbery with the use of a deadly weapon; battery with a deadly weapon; and resisting a public officer.

While some of these arrests tend to indicate a pattern of conduct by Herman that was relevant to the crime charged, the totality of their presentation makes the recitation substantially more prejudicial than probative. Arrests for possession of paraphernalia and crimes against nature have no bearing on Herman as a violent individual capable of murder.

We therefore conclude it was plain error to allow the prosecution, despite lack of objection, to read the presentence report to the jury. Some of the arrest information was not relevant to the sentencing phase and may have served to only inflame the passions of the jury in rendering the decision. We, therefore, remand the matter for a new sentencing proceeding.

## CONCLUSION

No plain error was committed by allowing Herman's DNA information linking him to the murder of Carter into evidence. A person who permits DNA information to be used in a public setting, with no express proscription limiting its use, cannot retain an expectation of privacy in his or her DNA profile. Additionally, because we conclude it was plain error to permit the presentence report to be read to the jury, we remand the matter to the district court to conduct a new sentencing phase. We have considered Herman's other assignments of error and conclude that they lack merit.