# Third District Court of Appeal

## State of Florida

Opinion filed November 19, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-2286
Lower Tribunal No. 12-16446
_____

**The State of Florida,**
Appellant,

vs.

**Darrell Gibson,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Milton Hirsch, Judge.

Pamela Jo Bondi, Attorney General and Michael W. Mervine, Assistant Attorney General, for appellant.

Herbert Erving Walker III, for appellee.

Karen M. Gottlieb; Wetherington, Klein & Hubbart; Greenberg Traurig and Elliot H. Scherker; Sonya Rudenstine for the Florida Association of Criminal Defense Lawyers and the Miami Chapter of the Florida Association of Criminal Defense Lawyers, as amicus curiae.

Before SHEPHERD, C.J., and SALTER and FERNANDEZ, JJ.

SALTER, J.

The State of Florida appeals an order granting a motion by defendant Darrell Gibson to suppress deoxyribonucleic acid (DNA) evidence obtained, analyzed, and placed in a law enforcement database with Gibson's uncoerced written consent. We reverse.

I.    The Record and Proceedings Below

In May 2012, Gibson approached a Miami-Dade police officer on the street near the scene of a homicide-arson investigation in progress. After Gibson indicated that he lived on the same block and might have information about the incident, he was brought to a detective investigating the crime scene. Gibson spoke freely with the detective for about a half-hour.

The detective asked Gibson if he would sign a "Consent to Provide DNA Specimen for Laboratory Analysis" and provide DNA, apparently to rule out Gibson as a suspect in the investigation. Gibson asked no questions about the form before signing it. The form provides:

> I, DARREL T. GIBSON, HEREBY FREELY AND VOLUNTARILY CONSENT TO PROVIDE MDPD POLICE OFFICERS WITH A MOUTH SWAB SPECIMEN FOR INVESTIGATIVE PURPOSES. I HAVE BEEN FULLY INFORMED THAT THIS SPECIMEN WILL BE ENTERED INTO A DNA DATABASE AFTER ANALYSIS.
>
> I HAVE BEEN FULLY INFORMED THAT THE INFORMATION MAY BE AVAILABLE TO MY PHYSICIAN UPON MY REQUEST, AND IT WILL REMAIN CONFIDENTIAL AND BE

2

USED FOR NO PURPOSES OTHER THAN INVESTIGATION, WHICH MAY LEAD TO CRIMINAL PROSECUTION.

I FULLY UNDERSTAND THAT I HAVE A RIGHT TO REFUSE TO GIVE THIS SPECIMEN. I HAVE READ AND UNDERSTAND THE ABOVE STATEMENT AND I CONSENT TO PROVIDE THIS SPECIMEN OF MY OWN FREE WILL WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO ME.

ADDITIONALLY, IN THE EVENT I CANNOT PROVIDE PROPER IDENTIFICATION, I VOLUNTARILY AGREE TO PROVIDE MY THUMBPRINTS AT THE TIME OF THE SWAB COLLECTION TO MDPD POLICE OFFICERS.

The form did not include a case number or any reference to the 2012 homicide-arson investigation.[1] The detective then took four swabs of cells from Gibson's cheek and turned them over to the crime laboratory for DNA analysis. The analysis produced a DNA profile that was placed in the Combined DNA Index System (CODIS), a law enforcement database and software system facilitating computer-based comparison analysis in much the same way fingerprints are digitized, stored, and compared by law enforcement software and analysts.

Although Gibson's DNA profile did not produce a potential match to any 2012 homicide-arson evidence, it did produce a match with DNA samples obtained

---

[1] The consent form included spaces for the name, race, sex, date of birth, address, Social Security number, and I.D. number (Florida driver's license), above the printed consent provisions. These spaces all were completed to identify the appropriate details relating to Gibson. Below the printed consent provisions, lines were provided for the signature of "CONSENTING INDIVIDUAL," and two witnesses, as well as lines for the date and time. Gibson and two witnesses signed the form and entered the date and time.

3

in connection with an open 2008 case involving the sexual assault and attempted murder of a 53-year-old woman in Miami.  After further investigation, Gibson was arrested and charged with two counts of sexual battery and one count of attempted murder in the 2008 case.

Gibson moved to suppress the DNA sample and comparison evidence on the basis that the scope of the uncoerced, knowing, voluntary, and written consent form signed by him did not authorize law enforcement use of his DNA for any purpose other than the 2012 homicide-arson investigation.  The trial court granted the motion, and this appeal by the State followed.

II.    Analysis

The trial court's order ignores a substantial, consistent body of state and federal law that analogizes DNA specimens, profiles, and databases to an older system of biometric identification—fingerprints.[2]    See, e.g., Anderson v. Commonwealth, 650 S.E.2d 702, 705 (Va. 2007), (citing, among other cases, Jones v. Murray, 962 F.2d 302 (4th Cir. 1992) and United States v. Sczubelek, 402 F.3d 175 (3d Cir. 2005), cert. denied, 548 U.S. 919 (2006)).  We have cited and followed Anderson on that issue.  Myles v. State, 54 So. 3d 509, 512 (Fla. 3d DCA 2010).

---

[2]    Fingerprints are now also digitized, added to the Integrated Automated Fingerprint Identification System (IAFIS), and compared by the Federal Bureau of Investigation and other law enforcement authorities.

It is also well settled in federal opinions that have addressed the issue, and in the Florida state courts as well, that law enforcement's "matching of a lawfully-obtained identification record against other records in its lawful possession does not infringe on an individual's legitimate expectation of privacy." Boroian v. Mueller, 616 F.3d 60, 67 (1st Cir. 2010).[3] See also Johnson v. Quander, 440 F.3d 489, 499 (D.C. Cir. 2006). In Washington v. State, 653 So. 2d 362, 364 (Fla. 1994), Anthony Washington "freely and voluntarily" provided hair and blood samples after being told the samples could prove or disprove his guilt in a sexual battery case unrelated to an earlier sexual battery and murder case in which law enforcement already suspected Washington was the perpetrator. The hair and blood samples, together with DNA analysis obtained from the victim's body and Washington's blood, were part of the evidence at the trial of the earlier crime. Washington was found guilty of the earlier sexual battery and murder, and he was sentenced to death.

In rejecting Washington's claim that his hair and blood samples could not be used to inculpate him in the earlier sexual battery and murder case and should have been suppressed, the Florida Supreme Court found that "once the samples were

_____

[3] U.S. Circuit Judge Calabresi observed in United States v. Amerson, 483 F.3d 73, 85 (2d Cir. 2007), that "The so-called 'junk-DNA' sequences stored in CODIS are not currently associated with any known physical or medical characteristics. Moreover, the [DNA] Act severely limits the circumstances and purposes for which the DNA profiles can be released and provides significant penalties for any misuse of the DNA samples or profiles." (internal footnote and citation omitted).

validly obtained, albeit in an unrelated case, the police were not restrained from using the samples as evidence in the murder case." Id. at 364. The Court reaffirmed that holding in Wyche v. State, 987 So. 2d 23, 27 (Fla. 2008):

> We further held in Washington that once the samples were validly obtained, they could be used in the unrelated murder prosecution. Thus, Washington established that when a defendant validly consents to the giving of the bodily substance, whether saliva, hair, or blood, for use in a criminal investigation, the characteristics of the substance can be used in investigations unrelated to the one for which the defendant was told the sample was collected. This holding is logical because the DNA profile derived from a bodily substance like saliva, hair, or blood is a constant identifying fact that does not change or disappear.

The trial court's order would blaze new juridical trails[4] by requiring, retrospectively, a more detailed disclosure in order to obtain consent to a buccal swab, DNA analysis, and inclusion of the resulting profile in the CODIS database. Because of the trial court's concern regarding "the encroachment of advancing technology," and that court's view that Gibson was giving his "unique genetic code to governments and government functionaries around the world, to use when they like as often as they like, for whatever purposes they like," the trial court held that the scope of Gibson's consent should be confined to limit the use of his DNA

---

[4] That may be an overstatement; the order was presaged by United States Court of Appeals Judge Alex Kozinski's dissent in United States v. Kincade, 379 F.3d 813, 871 (9th Cir. 2004), including a concern regarding "this power of technology to shrink the realm of guaranteed privacy." (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001)). In Kincade, however, the Ninth Circuit debated the circumstances under which DNA profiling may be compelled, not those in which consent has been obtained (as in the present case).

6

to the homicide-arson investigation for which it was originally sought.[5] The trial court's analysis of the written, signed consent form was based on an explicit predicate that "the case at bar cannot be adjudicated without addressing the extent to which the lay public is conversant with forensic DNA technology" and "the extent to which that technology is taken into account by an ordinary member of the public in fashioning a voluntary consent."[6]

Our analysis and conclusions are otherwise, based on three sources of authority: (a) the language of the consent form and the absence of any verbal representation that the detective's use of Gibson's DNA profile would be limited to the 2012 homicide-arson investigation; (b) the holdings in federal courts and fourteen other states that have considered this issue; and (c) federal and Florida legislative initiatives that continue to address the potential for the misuse of our citizens' private genetic information.

### A.    The Consent Form

The trial court rejected the unambiguous form of consent set forth at the outset of this opinion because it did not reveal a purportedly-unlimited scope—that Gibson had inadvertently "consented to having his DNA tested in connection with

---

[5] "Order on Defendant's Motion to Suppress," August 29, 2013, State v. Gibson, Case No. F12-16646 (Fla. 11th Jud. Cir.), p. 17 and n.3.

[6] Id. at p. 3.

every unsolved crime as to which biological or genetic evidence exists or will ever exist—not just in Miami, not just in Florida, but throughout the United States and in dozens of foreign countries."[7]  Of course, the same objection could be asserted with respect to fingerprints, but that objection has also been rejected by the federal and Florida courts.

The determinative phrases of the consent, and thus the scope of the use of the specimen, are: (1) that the mouth swab specimen would be used for "investigative purposes," with "purposes" in the plural and no limitation specified; and (2) "that this specimen will be entered into a DNA database after analysis," disclosing that the specimen would be analyzed and that it would go into a collection of other DNA analyses used for those "investigative purposes."

Applying the objective reasonableness test of Illinois v. Rodriguez, 497 U.S. 177 (1990), a reasonable person in Gibson's position would have understood that he was relinquishing the physical possession of cells swabbed from his cheek for analysis by law enforcement authorities and entry into a DNA database.  Once taken from him with his consent, those cells are not significantly different than a blood or hair sample—they cannot be restored to their former location in Gibson's body, and there is no reason to do so.  Gibson did not question or challenge law

_____

[7] Id. at p. 6.

8

enforcement's right to possess and use—for investigative purposes—that cell sample and the DNA within it.

In Florida v. Jimeno, 500 U.S. 248, 251 (1991), it was held to be objectively reasonable for a law enforcement officer, after validly obtaining consent to search an automobile, to open a closed paper bag on the automobile's floor—because, among other reasons, the suspect "did not place any explicit limitation on the scope of the search." In the present case, Gibson also placed no explicit limitation on the scope of his consent to the analysis and use of his DNA for investigative purposes.

The trial court concluded, and Gibson argues, that CODIS is not just a database, but rather a complex software infrastructure requiring additional disclosure in the consent form. As detailed previously and below, however, controlling federal and state precedent are otherwise. The CODIS database, or "databank" as it is sometimes identified,[8] meets the dictionary definition of "database" as that term was used in the consent form: "a usually large collection of data organized especially for rapid search and retrieval (as by a computer)."[9] The United States Courts of Appeals for the Second and Ninth Circuits have also referred to CODIS as a database. Amerson, 483 F.3d at 76 (stating that CODIS is

---

[8]  "DNA Databanking: Selected Fourth Amendment Issues and Analysis," Congressional Research Service Report R41847, June 6, 2011 (available at www.crs.gov) (hereafter, "DNA Databanking").

[9] www.merriam-webster.com/dictionary/database (site last visited Oct. 29, 2014).

"a national database"); <u>United States v. Kincade</u>, 379 F.3d 813, 819 (9th Cir. 2004) (identifying CODIS as "a massive centrally-managed database linking DNA profiles culled from federal, state, and territorial DNA collection programs, as well as profiles drawn from crime-scene evidence, unidentified remains, and genetic samples voluntarily provided by relatives of missing persons.").

      B.      <u>Persuasive Analysis from Federal and State Courts</u>

The federal cases previously cited have upheld the use of DNA profiles obtained lawfully with comparison-testing and use in an unrelated criminal investigation. The Maryland Court of Special Appeals recently surveyed state law cases on this issue and summarized them in <u>Varriale v. State of Maryland</u>, 96 A.3d 793, 797 n.3 (Md. Ct. Spec. App. 2014):

> Many other states have also held that the Fourth Amendment does not bar the police from using lawfully-obtained DNA samples in unrelated criminal investigations. <u>See</u> <u>Washington v. State</u>, 653 So. 2d 362, 364 (Fla. 1994); <u>Pace v. State</u>, 271 Ga. 829, 524 S.E.2d 490, 498 (Ga. 1999); <u>State v. Hauge</u>, 103 Haw. 38, 79 P.3d 131, 145 (Haw. 2003); <u>Smith v. State</u>, 744 N.E.2d 437, 439 (Ind. 2001); <u>Commonwealth v. Gaynor</u>, 443 Mass. 245, 820 N.E.2d 233, 243 (Mass. 2005); <u>State v. Bowman</u>, 337 S.W.3d 679, 685 (Mo. 2011); <u>State v. Notti</u>, 2003 MT 170, 316 Mont. 345, 71 P.3d 1233, 1238 (Mont. 2003); <u>Herman v. State</u>, 122 Nev. 199, 128 P.3d 469, 473 (Nev. 2006), *overruled in part on other grounds,* <u>Nunnery v. State</u>, 263 P.3d 235 (Nev. 2011); <u>People v. Baylor</u>, 97 Cal. App. 4th 504, 118 Cal. Rptr. 2d 518, 521 (Cal. Ct. App. 2002); <u>People v. Collins</u>, 250 P.3d 668, 674 (Colo. Ct. App. 2010); <u>State v. Barkley</u>, 144 N.C. App. 514, 551 S.E.2d 131, 135 (N.C. Ct. App. 2001); <u>People v. King</u>, 232 A.D.2d 111, 117, 663 N.Y.S.2d 610 (N.Y. App. Div. 1997); <u>State v. McCord</u>, 349 S.C. 477, 562 S.E.2d 689, 693 (S.C. Ct. App. 2002);

Pharr v. Commonwealth, 50 Va. App. 89, 646 S.E.2d 453, 458 (Va. Ct. App. 2007).

Our research has disclosed no federal or state authority suppressing the use of DNA profile evidence on facts similar to those in the record here, including the failure by a law enforcement officer to explain in detail "forensic DNA technology" or the longevity and reach of a profile entered in the CODIS database.

### C. Legislation Addresses Permissible and Prohibited Uses

The trial court's concerns regarding the private personal information that might be gleaned from DNA—even from the "junk DNA" profiles created as unique identifiers in the CODIS system—have been considered by Congress and the Florida legislature. There is an obvious need to balance the importance of DNA profiles as a benefit to law enforcement[10] and wrongfully-convicted persons alike[11] with the privacy concerns expressed by the trial court.

---

[10] "Modern DNA testing can provide powerful new evidence unlike anything before. Since its first use in criminal investigations in the mid-1980s, there have been several major advances in DNA technology, culminating in STR [short tandem repeat] technology. It is now often possible to determine whether a biological tissue matches a suspect with near certainty." Dist. Attorney's Office for Third Jud. Dist. v. Osborne, 557 U.S. 52, 62 (2009).

[11] B. Garrett, Convicting the Innocent, p. 217 and passim, Harvard Univ. Press (2011). As Professor Garrett observes, DNA evidence has not only sustained claims of actual innocence; in many cases it has also resulted in the conviction of the actual perpetrator. Id. at pp. 231-34.

The federal legislation, principally 42 U.S.C. § 14131 et seq., provides authority for, and limitations on, the collection and use of DNA samples. These statutes have been amended as DNA technology has evolved. 42 U.S.C. § 14132(d) "mandates expungement of DNA samples upon an arrestee's showing of discharge or acquittal or a convict's showing that the conviction was overturned."[12]

In Florida, section 943.325, Florida Statutes (2012), titled "DNA database," begins, "The Legislature finds that DNA databases are important tools in criminal investigations, in the exclusion of individuals who are the subject of criminal investigations or prosecutions and in detecting recidivist acts." Subparagraph (16) of that statute provides the circumstances under which a person may compel the removal of his or her DNA sample and analysis from the statewide DNA database.

A separate statute, section 760.40, Florida Statutes (2012), the "DNA Database Act," regulates the performance and use of DNA analysis, but does not apply to "criminal prosecution," determinations of paternity, or DNA analysis conducted under section 943.325. The balancing of the competing law enforcement and privacy interests is, in short, a matter of continuing legislative attention.

III.    Conclusion

---

[12] "DNA Databanking," at p. 7. The report also describes, at footnote 62, some of the complaints about the expungement provisions.

Federal and Florida courts, as well as those of other states, have not interpreted the Fourth Amendment to require a more detailed disclosure and consent requirement of the kind demanded by the trial court. To the contrary, DNA samples, profiles, and databases have been assessed in substantially the same way as other biometric identifiers, particularly fingerprints. The trial court's order is a substantial and unsupported departure from controlling precedent.

The suppression order is reversed and the case remanded for further proceedings.